Pages 1 - 32

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE MAXINE M. CHESNEY

```
JIMY RUIZ,                          )
                                    )
             Plaintiff,             )
                                    )
   vs.                              ) No. C 24-6776 MMC
                                    )
GLAXOSMITHKLINE CONSUMER            )
HEALTHCARE HOLDINGS (US), LLC,      )
                                    )  San Francisco, California
             Defendant.             )  Friday
                                    )  December 13, 2024
_____    )  10:00 a.m.
```

**TRANSCRIPT OF ZOOM VIDEO CONFERENCE PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:          CHARLES C. WELLER, APC
                        11412 Corley Court
                        San Diego, California 92126
                   BY:  **CHARLES CHRISTOPHER WELLER, ESQ.**


For Defendant:          MORGAN, LEWIS AND BOCKIUS, LLP
                        1701 Market Street
                        Philadelphia, Pennsylvania 19103
                   BY:  **FRANCO A. CORRADO, ESQ.**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

<u>**Friday - December 13, 2024**</u>                    <u>**10:17 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

**---oOo---**

    **THE CLERK:**  Civil Case Number 24-6776 Jimy Ruiz, et al versus GlaxoSmithKline Consumer Healthcare Holdings.

Will counsel please state your appearances, starting with plaintiff's counsel.

    **MR. WELLER:**  Good morning, Your Honor.  Charles Weller on behalf of the plaintiffs.

    **THE COURT:**  Good morning.

    **MR. CORRADO:**  Good morning, Your Honor.  Franco Corrado of Morgan Lewis on behalf of the defendant.

    **THE COURT:**  Very good.  Thank you.

Well, we're having this proceeding by Zoom instead of in person because of a particular ailment that one of counsel is experiencing.

Frankly, I am totally under the weather.  I'm losing my voice.  It's probably just as well that we're doing this hearing now because I think that I can make certain rulings; and if you were waiting for a big long order, as some of these orders in these cases have been, particularly with the holidays and how I feel, you're not going to get it for a long time.

All right.  As a short form on the order, I think there are deficiencies in the Complaint.  I don't think they are necessarily irreparable.  So I want to point out where I think

1   differences would be needed in making a Complaint that

2   satisfies *Iqbal*, *Twombley* and whatever.

3        The motion is under 12(b)(6) and 9(b).  I always kind of

4   wonder about 9(b).  It's kind of interesting because in the old

5   days, before *Iqbal* and *Twombley* we had 9(b), and it was

6   important at that time because it really set forth a much

7   higher standard of pleading than what was required at that

8   point, before you sort of said, you know:  They did me wrong

9   and I was damaged and go figure it out in the discovery.

10       But, in particular, when *Iqbal* and *Twombley* came out, they

11  start merging quite a bit with 9(b), but 9(b) still has, I

12  guess, some specifics apropos of fraud claims.  So it's still

13  there.  It's just -- it always strikes me as I'm not sure how

14  much it really adds, other than maybe just pointing out for the

15  particular cause of action where you've got to be specific.

16       So we have the issues as follows, in my view.

17       The first is whether or not the plaintiff has pled enough

18  of the elements that they would need to plead in order to show

19  there's a false statement or at least a misleading statement,

20  and that why it's not true in full, if you take it on the

21  plaintiff's understanding of what they thought the label meant.

22       So we've got a question about -- along with that, issues

23  about what's a flavor.

24       Has the plaintiff pled that there is an artificial flavor

25  being used in the way that the regs would cover it?

```
 1          Is the particular label misleading?  Has the plaintiff
 2   pled enough to entitle them to injunctive relief, if they pled
 3   a claim?
 4          Is their claim for equitable relief essentially barred if
 5   there is a legal claim available?
 6          And so those are the issues.  And I just want to jump into
 7   something for a moment that I thought was kind of interesting
 8   about this whole case.
 9          I don't know why everybody interested in malic acid.
10   Malic acid -- well, the defendant says:  Hey, nobody has, you
11   know, malic acid flavored fizzy drink or whatever.  Where is
12   this all coming from?
13          And ordinarily I think the idea of these -- these statutes
14   or regulations concerning flavors is with an eye toward, let's
15   say, you get something that's, I don't know, cheese flavored or
16   banana flavored or whatever.  And the question is:  Did it
17   really come from a natural source or did somebody concoct it in
18   a test tube in a lab?  And if they used both, because the
19   natural was kind of more expensive or hard to get your hands on
20   and they have got some guy in a lab coat who is making it taste
21   just the same, people may still want to know that.
22          Now, the plaintiff here is not pleading, as far as I can
23   tell, that there is an artificial orange flavor.  They are
24   pleading that malic acid is the flavor and it's artificial.
25          And so I was just wondering if in saying in Your
```

1  Complaint, Mr. Weller, that malic acid is used in some fashion

2  to create artificial flavoring -- we'll use orange because

3  that's your primary exemplar.  But let's say that somebody who

4  can't get enough of just orange concentrate or whatever the

5  flavor, whatever they are trying to do, says:  Okay, we're

6  going to go in the lab and we'll just put together the same

7  sugars and acids that ordinarily are found in oranges and what

8  gives orange its flavor that people then ascribe to oranges,

9  we'll just put them all together in a lab, mix them up, shake

10  them up, and now we'll have artificial orange.  Okay?

11      Now, if that were the case, if somebody added to this

12  drink, let's say, the super orange drink, not only orange

13  concentrate to taste like orange, but they actually made fake

14  orange, then you would have to say on the label either

15  "natural" and "artificial flavor," or whatever would comply

16  with the regulation; or if somebody just said:  Oh, forget

17  orange concentrate.  Let's just cook up a batch of orange

18  flavoring in the lab, and then that will be a fizzy orange, and

19  we will put "artificially flavored."  Okay.  But you're not

20  really pleading that they are selling artificial orange, as far

21  as I can tell.  Were you trying foe do that?

22          **MR. WELLER:**  Your Honor, I think we did that in

23  Paragraph 26 of the Complaint.

24          **THE COURT:**  Well, let me look at it because I sure

25  didn't come away with that feeling.  I got the feeling that you

1    said the problem here is they've added malic acid as flavoring,

2    along with the orange.  Okay.

3            **MR. WELLER:**  There is no such thing as malic acid

4    flavoring.  Malic acid --

5            **THE COURT:**  Not in your Complaint there isn't.  And

6    that's -- if you want to say that, you're going to have to --

7    you're going to have to say it.  So far you haven't.

8            **MR. WELLER:**  What we said in Paragraph 26 --

9            **THE COURT:**  I'm there now.  I'm going to just read it

10   to you.

11           **MR. WELLER:**  Okay.

12           **THE COURT:**  (As read):

13            "By adjusting the ratio between sugars and acids

14       for the use of malic acid in foods and beverages" --

15       I'll need to know exactly what that means.  Close

16       quote.

17       I'll start over.  Quote, I'll just read the whole thing

18   straight.  (As read):

19            "By adjusting the ratio between sugars and acids

20       through the use of malic acid in foods and beverages,

21       a manufacturer is enabled to create or simulate from

22       scratch a flavor, such as orange or strawberry,

23       through replication of a sugar acid ratio present in

24       oranges and strawberries in nature."

25       Let's assume that's correct.  Okay?  You sure haven't said

```
1   they did it here.  All right?  We're not talking about what you
2   can do generally.  That might be a preliminary paragraph and
3   then you get down to:  We had a lab test it and somehow the lab
4   was able to tell that there was something here that signaled
5   that they were making artificial orange.
6       Now, I don't know if they can do it, and maybe that's why
7   you didn't plead it.  But you may not -- and I don't know if
8   you're able to plead it, but in any event, that would be the
9   typical case.  You have artificial banana, artificial orange,
10  artificial strawberry, and we can figure that out because.  And
11  then you put in the "because."
12      And if it is in an expert area, my feeling is, in any
13  pleading, once the pleader gets away from common experience,
14  you do need expert backup.  Because what we've done is we've
15  gone from trials with witnesses, summary judgment with
16  declarations and depositions.  And now we are at pleading,
17  which is essentially an offer of proof.
18      So you would need some expert -- I mean, apparently, you
19  paid a lab to look at this stuff -- to say something about the
20  artificiality.  It would be nice if you could say they have
21  artificial orange, get away from fake malic acid.  Okay?  Sure
22  it's not the hallmark of the drink.
23          MR. WELLER:  I'd also like to bring your attention to
24  Paragraph 37.
25          THE COURT:  That's all right.  We will go up there,
```

```
 1    too, but I've been through them.
 2        Okay.  You're back to changing the ratio.  Now, this is
 3    very weird because here.
 4            MR. WELLER:  Paragraphs 36 and 37 --
 5            THE COURT:  I realized you have to read them all
 6    together.
 7            MR. WELLER:  Okay.
 8            THE COURT:  You say (as read):
 9             "A food manufacturer uses" -- that's just
10        generality again -- "malic acid to simulate or
11        reinforce characterizing flavor of foods or
12        beverages."
13        Yeah, maybe they do.  Maybe they did here.  I don't know.
14        Then you say, quote, (as read):
15             "By changing the ratio between sugars and acids
16        that is normally found in fruits, the DL malic acid
17        used in the products by defendant reinforces,
18        simulates or creates."
19        "Creates" isn't a word, by the way, in any of these
20    particular regulations.  The regs themselves are not exactly
21    the best use of adjectives and verbs.  And what you end up with
22    is something anyway pleading in the alternative, and one would
23    say what is it?  Are you saying that is simulating the
24    characterizing flavors -- one of the problems is you want to
25    cover about 20 different drinks, but you may have to plead as
```

1    to any one of them.

2        They only tested certain of the products.  So without even

3    getting into whether the other products are as equally

4    composed, or one can infer that they are, of the ones that were

5    tested one might have to be a little more specific.

6        What you do say the lab found was the D isomer.  That's

7    somewhere in here.  And that -- that means -- what you say it

8    means is that there must be DL malic acid in the product.

9    However, your lab didn't say that to you, according to what

10    you've pled.

11        In other words, you've combined lab result with your

12    conclusion.  Not lab result, lab conclusion.  All right?  So

13    you get test result and then no opinion from the lab other than

14    it means there's DL -- I'm sorry.  I don't even think it says

15    that.  Let me go back for a minute.

16        **MR. WELLER:**  Your Honor, the Complaint alleges that

17    the lab found the D isomer in the malic acid, which is --

18        **THE COURT:**  So what?  Okay?  That's what I said.

19    You're in 21.  You didn't even cite me to 21 in your papers.

20        But anyway, 21 was one of your better paragraphs.  And it

21    says that, quote (as read):

22            "When testing a product to determine whether it

23        contains artificial DL or natural L malic acid, the

24        industry standard is to test for the presence of the D

25        isomer."

1          Well, that's you talking, but let's just say for a moment

2   that might be good enough.  Okay?  Although if your lab told it

3   to you, it would be better obviously since you're not an

4   expert.

5          Okay.  So you say:  All right.  The industry standards

6   test for the presence of the D isomer of malic acid.  This

7   isomer is not present in any amount in L malic acid.  That's

8   you talking again.

9          Then you go on (as read):

10              "Therefore, the presence of the D isomer of malic

11         acid in any amount in food or beverage indicates that

12         the use of DL malic acid instead of natural L malic

13         acid" -- I'm sorry -- "indicates the use of A instead

14         of B."

15         If you actually heard that from the lab, wouldn't it be

16  better to say the lab told you that; or that if it is the

17  industry standard where you found, I found.

18         Okay.  In any event, all it says is that that is

19  indicative of DL malic acid.

20         Now, DL malic acid simply sitting around in a product

21  doesn't necessarily mean it's being used to do anything in

22  particular with it.  It could be that it is used as a flavor.

23  You say malic acid has a flavor.  Of course, you haven't pled

24  that.  All right.  But let's say it does, just for argument's

25  sake.  Then you have -- does the -- is the product advertised

1    as essentially promoting that flavor?  Probably not.  Is it

2    being used in some way that would be covered by the

3    regulations?

4         So we have here that malic acid can be used to -- as a

5    flavor.  It can be an enhancer, in which case you don't have to

6    say it's artificially flavored.  There are different ways it

7    can be used.

8         I'm just telling you I'm not going to accept what you've

9    got here, which is a bunch of stuff scattered around trying to

10   make it look like you've pled something when you really

11   haven't.

12        And I know that you can do it if you have to, or at least

13   know what you have to do because you have been involved in this

14   field, and there are 8 trillion cases where courts are throwing

15   things out saying they are not good enough.  And I'm not even

16   talking about *Trammell*.  All right?  Because the *Trammell*, if

17   you're right, that actually the label had a lot more specifics

18   than were acknowledged in the order may make a difference

19   there.

20        All right.  But I don't think you have to say every single

21   test the lab ran in -- you know, did they use the blue dye test

22   or put it under a microscope to come out with whatever they

23   found; but whenever the opinion is needs to come from your lab,

24   not you.  And right now there's nothing to say that this stuff,

25   if in there, is always -- if it's there, if the lab found it,

```
 1    it's always used to do a particular thing and, therefore, one
 2    can assume it was used that way here or can they actually test
 3    for it in this product, I have no idea.
 4         MR. WELLER:  Your Honor, I think you're referring to
 5    expert testimony, and we're looking at plausibility on here
 6    and --
 7         THE COURT:  It's not plausible the way it's pled.
 8         MR. WELLER:  Let me --
 9         THE COURT:  It's generalities, not specifics.
10         MR. WELLER:  Allow me to go through that so we can
11    perfect the record here.
12         THE COURT:  You're going to lose anyway, but I'm going
13    to give you a chance to amend; and if you can't amend, then
14    you'll care about your record.  Today you probably shouldn't.
15         Okay.  But go ahead.
16         MR. WELLER:  That's very kind of you, Your Honor.
17         All right.  So on these testing allegations, we plead who,
18    which is Krueger Food Laboratories.
19         THE COURT:  Nobody is saying you didn't.
20         MR. WELLER:  The win, April 30th, 2024.  The what,
21    which are the products purchased by a plaintiff.  Where,
22    Chelmsford, Massachusetts.  How, which is the industry standard
23    method of testing foods for the D isomer of malic acid, whose
24    presence establishes that the malic acid used is DL-malic acid.
25         And if you look at 21 C.F.R. Section 184.1069(a) -- and
```

```
1   this is in our Complaint, Paragraphs 30 through 33 -- DL-malic
2   acid does not occur naturally.  In these testing results we
3   adequately allege that the malic acid used in the products is
4   artificial.  And the defendant has a right to challenge this
5   testing later, but the issue of it here is on a Rule 9(b).
6   Okay?  And on a Rule 9(b) does the defendant have the
7   information they need to respond and not make simply a general
8   denial, and they do.
9        Rule 9(b) only requires that plaintiffs provide the Court
10  some assurance that the theory has a basis in fact.  That's
11  from the Ninth Circuit, but we think we met that pleading
12  standard.
13       Many courts in California and in the Ninth Circuit have
14  accepted that as sufficient for Rule 9(b) in these cases.  And
15  I would hope this Court would do the same as well.
16       We don't need to prove the case at the pleading stage.  We
17  just have to show that our allegations are plausible.  We don't
18  have to weigh any probabilities.  And we've made the
19  allegations to connect the dots sufficiently to allege that the
20  malic acid is artificial and that it's being used as a flavor.
21            THE COURT:  Okay.  You're relying on 184.1069, the
22  definition of malic acids, or --
23            MR. WELLER:  The code section I cited was 21 C.F.R.
24  184 --
25            THE COURT:  Oh, okay.  Yeah.
```

1      **MR. WELLER:**  -- which simply states that the DL-malic

2   acid does not occur naturally.

3      So that's our allegation to support the fact that it's

4   artificial.

5      **THE COURT:**  That's fine.  In other words, that you

6   can't find DL-malic acid out in the real world, so to speak,

7   the fruity world, if you will.  All right.  And that your lab

8   found the L -- the D isomer.

9      **MR. WELLER:**  The D isomer, correct.

10      **THE COURT:**  And that you then say the lab didn't tell

11   you.  In other words, the lab said it's okay we found D isomer.

12      Is that all they ever said to you?

13      **MR. WELLER:**  Yes.  The rest is expert testimony

14   because --

15      **THE COURT:**  I'm sorry.  I'm not asking you whether

16   it's expert testimony.  I'm asking you what the lab told you.

17      **MR. WELLER:**  Yes.  That's what the lab told us.  They

18   detected the D isomer.

19      **THE COURT:**  Period.  End of discussion.

20      **MR. WELLER:**  Yes.

21      **THE COURT:**  All right.  So if you want to say that

22   somewhere you have come to the conclusion that that means that

23   there is DL-malic acid in a product, okay, and thus in this

24   product, okay, where are you getting that information from if

25   the lab didn't give it to you?

1          **MR. WELLER:**  The lab did give it to us.

2          **THE COURT:**  Fine.  That's what I asked you, whether

3    they told you that means that it's DL-malic acid.

4          **MR. WELLER:**  Yes.

5          **THE COURT:**  Well, then you can put those words in

6    their mouth instead of yours.

7       All right.  Then you still have a problem.  How is this

8    artificial malic acid being used in this product?

9       Where do you plead how it is being used that would be

10   covered by the regulation that requires a disclosure of

11   artificiality.

12         **MR. WELLER:**  Let's look at the Complaint, Paragraph

13   16, Paragraph 19.  We also go back to Paragraph 26, which we've

14   already explored.  We believe those allegations are sufficient

15   to support --

16         **THE COURT:**  No, no.  Wait.  16 has to do with an

17   entirely different issue we haven't even gotten to.  16 has to

18   do with what a reasonable consumer would understand.

19      I'm asking you where you have pled how in this product the

20   artificial malic acid is being used.

21         **MR. WELLER:**  The malic acid is being used --

22         **THE COURT:**  Are we back to that A, B and creates stuff

23   paragraph?

24         **MR. WELLER:**  Correct.  [As read]:

25           "Create or simulate from scratch a flavor, such

1         as orange or strawberry, through the replication of a

2         sugar and acid ratio present in oranges and

3         strawberries in nature as to create the artificial

4         flavor."

5         So Section C, if you look at Paragraphs 24 through 37, we

6    go -- from 24 through 37, we describe in great detail how

7    exactly that malic acid is used in the products as a flavor.

8         **THE COURT:**  Where are you saying how it's used in --

9    -- let's just take super orange.  Where do you say how malic

10   acid is being used in super orange?

11        One place is you say in general a manufacturer can create

12   or simulate a flavor.  Now, you seem to have the idea -- and

13   I'm not -- I don't think I agree with this, all right, that if

14   you take something as a component to create something in a

15   lab -- in other words, you throw in some malic acid, you throw

16   in some ascorbic acid, and you throw in some sugar and some

17   other stuff, whatever it is, and you end up with orange flavor,

18   although it didn't come out of an orange, that every one of

19   those components is orange flavor.

20        Sort of like potatoes, carrots and beef and some gravy

21   makes beef stew, so carrots are beef stew.  I don't accept that

22   analysis.

23        So if all you want to say is it's used to create

24   artificial orange as one of the many components that sort of

25   adjusts ratios in some way, I'm not sure that's a correct

1    reading of what a flavor is.  "Create" is your word, not what I

2    found in the regs anywhere.

3         **MR. WELLER:**  The regs talk about simulating, which

4    is --

5         **THE COURT:**  "Simulating" means to act as, not to make

6    up.  Act as.

7         **MR. WELLER:**  If we go back to Paragraph 37, Your

8    Honor, I think that is how the malic acid here is functioning

9    as a flavor within the meaning of the statute, within 21 C.F.R.

10   101.22.

11        **THE COURT:**  All right.  What you've got here to do --

12   which part of it do you want to read at 101.22?  Which part are

13   you focusing on to make your argument?

14        **MR. WELLER:**  Well, I think the 101.22 --

15        **THE COURT:**  Yeah, I have that.

16        **MR. WELLER:**  -- defines what DL-malic acid is and how

17   it -- defines how a flavor functions.

18        **THE COURT:**  Well, where do you want me to read?

19        **MR. WELLER:**  Section I(2).

20        **THE COURT:**  I(2).  Okay, I(2).  The words are

21   "simulates."  Okay.  That's pretends to be.  Resembles.  Seems

22   a lot like it or reinforces.  Makes that flavor stronger, I

23   guess, but it still has to be a flavor itself.

24        And ordinarily if you add some flavor other than orange,

25   fake orange, you may end up with -- in other words, if you use,

1  like, natural orange and fake orange, the fake orange would be

2  reinforcing the natural orange.  Okay.

3      If you put something else in it, that could maybe

4  reinforce it.  That's not a word you've used there.  You've

5  used "creates."

6          MR. WELLER:  No.  We use the word "reinforce" in

7  paragraph --

8          THE COURT:  I'm sorry.  "Reinforce" is your first.

9      But it's all in the alternative.  It's not in the

10 conjunctive.  And only certain of these words -- when you get

11 to "creates," you've got a problem there.

12     So going back for a moment though, just to look, it

13 reinforces the characterizing flavor which is essentially what

14 the food is advertised to be.  So orange drink, okay.

15         MR. WELLER:  Okay.

16         THE COURT:  So I don't know if any cases have actually

17 looked at what they mean by "reinforces."  And these regs have

18 used various words that almost duplicate each other in ways

19 that would be self-canceling.

20     I really -- clearly, somebody who was an English major

21 didn't put these things together.

22     But what we're looking at is if you wanted to say that

23 it's reinforcing in some way, if that's your best bet, you

24 haven't really said how.  All right?  You can't just say it.

25 That's conclusory.

1    And if the lab actually was looking for what these various

2    things did, as I say, I'm curious because what -- the

3    manufacturer, if they were doing it, is trying to make it taste

4    more orangey.  Okay?  And they can do that by putting more

5    orange in it, which would be artificial orange, for example, or

6    they could -- on top of their natural orange, if they wanted to

7    do that, or maybe there's some other way that they interact

8    that you could plead.

9        But right now you haven't really done that.  And what you

10   did say is that -- it's very strange to say:  Changing the

11   ratio that's naturally found in fruits.  Wouldn't they want to

12   try to duplicate the ratio in a lab that's naturally found so

13   that it comes out the same way?  Why would they want to change

14   it?

15        **MR. WELLER:**  I think by changing the ratio, you can

16   fine-tune flavoring?  And that's what our expert would have to

17   testify for?

18        **THE COURT:**  Yeah.  What does that mean?  You would

19   make it taste more orangey than real oranges, or what --

20        **MR. WELLER:**  I think what we're talking about is

21   flavor adjustment.  I think we're getting into minutiae here,

22   Your Honor.

23        **THE COURT:**  Let's put it this the way.  You've got a

24   lot of paragraphs that don't say things directly.  All right?

25   And if there is a way to do it, fine.

```
 1          I'm going to hear from Mr. Corrado on this, and then we
 2   can get back to you as required.
 3          As I say, I am going to dismiss it.  And so you can be
 4   thinking about what I said, but you haven't convinced me.  All
 5   you've said is we can be sloppy, and I don't think you can be.
 6          Okay.  Mr. Corrado?
 7          MR. CORRADO:  Your Honor, thank you for giving me the
 8   opportunity here.
 9          I really don't have much to add to the conversation here.
10   I mean, you know, you're very obvious fastened with the papers,
11   the regulations in the law that have been fully briefed before
12   you.  And, you know, we've certainly asserted grounds beyond
13   the 9(b) argument why the claims would fail, including plain
14   language, and the other issues that you raised today.  Unless
15   you have specific questions for me, Your Honor, I will just let
16   the record stand.
17          THE COURT:  Okay.  I may get to something a little
18   further on in the analysis that I will get back to you on.
19          This is my view of this, that 9(b) doesn't allow you to
20   just fill in conclusory blanks.  All right?  It's fine to say,
21   as the plaintiff has, who bought it, where they saw whatever
22   they saw, what they saw.  Fine.  That's all in accord with
23   9(b).
24          When get to the part about why what they saw isn't
25   truthful, you get into a problem of having to plead why it's
```

1  not truthful.  And that is something that's 9(b), it's

2  *Twombley*, it's *Iqbal*, it's whatever.

3      If you look at *Twombley*, they pled themselves out of the

4  case.  All right?  They had so many facts that the Court said:

5  Fine, your facts could support two perfectly reasonable

6  assumptions; one that doesn't work for you, so you lose.

7      Now, let's go back to some of the other issues.  And I'll

8  tell you, I went over this Complaint a million times trying to

9  figure out exactly how it could be pieced together.  Decided it

10 was not possible to piece it together.

11     So another issue that we have has to do with the question

12 of has the plaintiff even pled, for example, that even if there

13 is artificial malic acid being used to flavor this drink in

14 some way, either by being orange flavor or looking to reinforce

15 orange flavor in some way, okay, but not just being some way

16 that they use it as one of the things that goes in the test

17 tube to create orange flavor in some fashion, is there anything

18 wrong with what they said?

19     Now, the plaintiff's position is you used these words

20 "natural," so there it means all natural.  That's all there is

21 in it.  No other flavors.

22     And I think we can say there's a large body of law that

23 has said if all that you say is that first part -- i.e.,

24 natural flavors -- that does not necessarily mean exclusively

25 natural flavors.

```
 1        Now, in fact, by using the word "with," which is in this
 2   particular label -- and I don't know what they all look like,
 3   but orange one says "with natural flavors."  Okay.  That "with"
 4   actually even cuts against it being exclusively because "with"
 5   means includes and not necessarily only.
 6        And then under it it's got something something and
 7   "natural sweeteners."  And it says "natural flavors," kind of
 8   in a bubble.
 9        Okay.  Now, so some plaintiffs have said:  Well, look at
10   the fruit you put on it.  Okay?  You put all these fruits on
11   it, pictures of fruit.  That clearly means that's all that's in
12   there is natural fruit.  Okay.  And the Court -- no, sorry,
13   that -- that really doesn't mean that either; i.e., you have to
14   have more.  What's your more here?
15        MR. WELLER:  Well, Your Honor, I think consumers have
16   to take the label at face value.
17        THE COURT:  Yes.  All right.  So what on the label,
18   besides a picture of an orange and the words "with natural
19   flavors" and, also, "natural fruit flavors," what's your --
20   your extra?  What's your plus here?
21        MR. WELLER:  Well, here it is.  The label says:  "
22           "Flavored fizzy drink mix with natural flavors."
23        Natural flavors" is in bold.  And it has "natural fruit
24   flavors" in a bold graphic call-out.  And it's also images,
25   which case law has said can also support that the -- the image
```

1    of a natural product, pictures of fresh fruit.

2        And also just as important, there is no statement of

3    artificial flavors.  There's no mention of anything being

4    artificial in the product.

5        But I think it's even more important to consider the

6    context here.  This is a low value purchase.  This is, what,

7    four or five dollars?  Less than ten bucks at most stores.  And

8    consumers often take four or five seconds in making selections.

9        And real-world consumer decisions, it's often hurried, and

10   consumer perception is considerably more limited than may be

11   intuitive.

12       And what the defense is doing and what the defendant is

13   doing is they are parsing out and dissecting this label as a --

14   as just a -- like a grammar expert.  And consumers don't do

15   that.  That's not normal consumer behavior.

16       And plaintiffs -- plaintiffs are entitled to present

17   evidence on how consumers actually understand these labels.

18   It's -- the reasonable consumer standard, it's only decided as

19   a matter of law in extremely rare cases.

20       And the Ninth Circuit has said this.  And what is a rare

21   case, Your Honor?  A claim that illustrates wishful thinking on

22   the plaintiff's part or runs counter to ordinary common sense

23   or the obvious nature of the product.  That's in the *Brady* v.

24   *Behr* case.  In other words, no reasonable consumer could be

25   misled.

1    But when you look at this packaging as a whole,

2 considering the fact that it's a low value purchase, a

3 reasonable consumer is going to think this is only naturally

4 flavored.  And that should be left up to the trier of fact.  I

5 don't think that should be decided as a matter of law.  This

6 isn't one of those rare cases.

7    **THE COURT:**  Well, I would say that there are lot of

8 cases that aren't rare cases and they sure look a lot like your

9 case.  Okay?

10    The one thing you seem to be relying that might be a

11 little different is this idea of it doesn't say "artificially

12 flavored," but, of course, would be true in a lot of the cases

13 that have been tossed out anyway on the theory that there is no

14 real indication that consumers are aware of the regulation and

15 wouldn't have any way of really ascribing any significance to

16 an absence.

17    **MR. WELLER:**  Your Honor, I --

18    **THE COURT:**  Excuse me.  Don't interrupt me because the

19 reporter will not take you down, and she will complain that

20 it's hard to take me down if you're talking at the same time.

21 I gave you a lot of latitude to talk, all right, making your

22 record.  But you're not going to convince me, because I'm not

23 being convinced from the get-go on your papers at all.

24    And as far as this particular issue goes, if you can plead

25 something more, then by all means give it a shot and see if you

```
 1   can.
 2        But my concern is that you are so concerned about having
 3   to do that that you really won't be able to and that's why you
 4   really care this much about it right now.
 5        But let's see.  Mr. Corrado, do you want to throw anything
 6   in on this point?
 7             MR. CORRADO:  I think you've accurately summarized our
 8   position on this point.
 9             THE COURT:  Okay.  Let's put it this way.  Because --
10   well, we still have a couple of other points.
11        I don't think that you ever necessarily pled the
12   underpinnings for entitlement to injunctive relief, if we ever
13   get to that point.  You haven't really pled why these
14   plaintiffs now being alert to the -- what you would say a lack
15   of truthfulness.  Can't tell that from just looking at the
16   label again.
17        So if there are ways they can be put more in the same
18   category as flushable wipes, which is almost a one-off as far
19   as the cases go, then I'll -- you can certainly give that a
20   shot as well.
21        But the last thing is the question of the equitable
22   relief.  Yeah, people can plead in the alternative.  They can
23   say:  You intended to shoot me, and if you didn't, it was
24   negligent.
25        But I -- I don't think that -- from what I have read on
```

```
 1    the case law that you can sit around and wait until the end and
 2    then say:  I'm going to pick this or that.  You can't pick
 3    equitable relief if you have a viable claim -- and I don't mean
 4    a winning one; I mean, a cognizable claim -- that's a legal
 5    claim that is asking for the same relief.  And these plaintiffs
 6    are asking for their money back.
 7         So to the extent that they are saying that they should get
 8    some kind of disgorgement of money from the defendant as an
 9    equitable matter, that really sounds the same to me as their
10    legal claim where they are trying to get their money back.
11         To the extent that they want injunctive relief, that's
12    allowed for, I believe, under the CLRA.  And so why do you need
13    this claim?
14         So you could be pleading that also if you think that any
15    of these other claims don't -- don't provide the same relief
16    that you're trying to get.
17         But I think the main point is going to be on amendment.
18    And I certainly will give you leave to amend, unless you want
19    to just, you know, stand on this Complaint and maybe someone
20    will say:  Oh, it's good enough.  Yeah.  Should go forward.
21    And maybe they won't.
22         All right?  So do you want leave to amend or not?
23         MR. WELLER:  Of course, we would love to have leave to
24    amend, Your Honor.
25         THE COURT:  All right.  How much time do you want to
```

```
 1    file an Amended Complaint?
 2              MR. WELLER:  With it being --
 3              THE COURT:  The holidays are coming.
 4              MR. WELLER:  Yeah, with the holidays we ask for 30
 5    days.
 6              THE COURT:  Okay.  So let's just see.  Let's pick a
 7    date and see where that even comes out.
 8         Okay.  So we're in mid-December.  So if you took four
 9    weeks, for example, you would be at January 10.
10         All right.  Now, do you want to go with that or -- I don't
11    want to shortchange you here.  I'm not trying to do that in any
12    way.
13              MR. WELLER:  Let's do the 17th.
14              THE COURT:  All right.  Any problem with that
15    Mr. Corrado?
16              MR. CORRADO:  I'm fine with that, Your Honor.
17              THE COURT:  Okay.  Ordinarily then you've got a couple
18    of weeks to respond.  Is that going to give you enough time?
19              MR. CORRADO:  We would certainly prefer some
20    additional time to respond to the Complaint.
21              THE COURT:  I will give you one extra one.  So you can
22    have until February 7th.  Okay.  All right.
23              THE CLERK:  Your Honor, currently the initial case
24    management conference is set for January 17th.
25              THE COURT:  All right.  We will move that.  I'm pretty
```

1   sure no matter what you do with your Amended Complaint,

2   Mr. Corrado is going to move to dismiss it.

3       So if he files on the 7th -- one, two, three, four,

4   five -- would take us into mid-March.  So why don't we move --

5   let's say, how about if we say that we'll move the case

6   management conference to May 16th with a statement by the 9th.

7   Okay?

8       Now, if that turns out to be farther off than is

9   necessary, you can give me a brief stipulation on good cause to

10  adjust that either way.  Okay?

11      All right.  So let me just make a note of that.

12          MR. CORRADO:  Just looking at my personal schedule,

13  would it be okay to nudge our response beyond the 7th?

14          THE COURT:  That's awfully far off.  Why would you

15  need more than three weeks to respond?  Are you going to be

16  away?

17          MR. CORRADO:  I'm supposed to be away that week and

18  prior.  If Your Honor has an aversion, we're happy to meet the

19  second week.  We can do that.

20          THE COURT:  Well, if there's a real problem, I can

21  move it one more.  Let me hear if Mr. Weller has any real

22  problem with that.

23          MR. WELLER:  I don't have an issue with that, Your

24  Honor.

25          THE COURT:  Okay.  So what day do you want, Mr.

 1  Corrado?  The 14th?  What's that?

 2          **MR. CORRADO:**  The 14th would be fine, if that's

 3  acceptable.

 4          **THE COURT:**  Okay.  All right.  Are you going skiing or

 5  something?

 6      Okay.  So then February 14th for you to respond, and the

 7  Amended Complaint will be due by January 17 I guess.

 8      Okay.  And then we'll say -- are those dates that I made

 9  as status conference dates okay?  May 16th with a statement by

10  the 9th?  It's by Zoom, you know.

11          **MR. CORRADO:**  Of course, Your Honor.  Thank you.

12          **THE COURT:**  Okay.  All right.  Okay.  Status

13  conference will be at 10:30 or as soon as we get to it.

14      So we're holding up a few status conferences now.

15      Let me say that this Complaint is touching upon what needs

16  to be pled and may well, at least, come a lot farther along in

17  that regard.

18      Mr. Corrado, you should be ready with cases that you feel

19  are going to be particular to this subject.

20      And you, too, Mr. Weller, in terms of -- I wouldn't --

21  let's leave *Trammell* out of the picture for now, as I do think

22  that it had a very strict view as far as the lab part went.

23  And that's even separate from what Mr. Weller had brought up,

24  if he's correct, about what that particular product actually

25  was advertised as.

1    But I do think that there is -- if you think of these

2    cases collectively, if you look at any individual one, it's

3    never going to go anywhere.  All right?  But if there are

4    certain patterns such as patterns about saying natural flavors,

5    patterns about tacking fruit on, and then what would be that

6    sort of special extra something in any of these cases?  You

7    might look at what might work and say:  This is the same or

8    different, whatever you want to do in that regard.  But let's

9    try and bring a little order out of chaos here.

10    If I have to read one more case about one more food, it's

11    just going to be just too much.  Possibly because I may not be

12    as picky a consumer as some people are, at least on some

13    things.

14    All right.  So getting back for a minute, just thinking

15    about it.  Take a good look at these regulations.  I feel that

16    they -- they have kind of created some of their own problems.

17    For example, let's go back to what an enhancer is for a minute.

18    I just have to find these.

19    All right.  Here is what an enhancer is.  It is used to

20    supplement, enhances or modify the original taste.  Now, they

21    are talking about original taste.  Whatever happened to

22    characteristic taste?  All right.  The original taste, okay,

23    without imparting a characteristic taste or aroma of its own.

24    Now, the words are "supplement," "enhance" or "modify."

25    We also know that words like "reinforce" are being used to

1  discuss what a flavor might be, which sounds like a word that

2  could be similar to "enhance." Certainly is a way of

3  modifying. In other words, "modify" is broader than

4  "reinforce."

5      I mean, I don't know what these people are thinking, but I

6  don't think they have looked at what they said in one place

7  when they go to the other.

8      And then -- but if it does all these things, but it does

9  impart a characteristic taste, all right. Now, a

10  characteristic taste sounds like that's what the label says the

11  food tastes like. So if it's not imparting its own

12  characteristics -- like, someone could say this is cran-apple,

13  all right? So you've got two flavors; apple, cranberry. Or

14  they may have some multi-fruit thing. But if they just have

15  one flavor that they are kind of promoting, not sure where that

16  all works out.

17      And then here is flavoring agent, "to impart or help

18  impart." All right. How does it help impart? Does it

19  reinforce? Does it enhance? They are making everybody's life

20  really, really difficult. And then they throw in somewhere,

21  just to sort of sound intellectual, the word "adjuvant," which

22  if you look at a dictionary, it doesn't have anything to do

23  with food. And maybe they are thinking "enhance" again. So

24  that could be sort of an idea that comes up in chemistry.

25      Anyway, I just think that they have made our life really

```
 1   hard, and so I just would encourage everybody to do the best
 2   they can with this now getting bigger and bigger body of law
 3   that really isn't being much more informative.
 4       So I'll leave you to it, gentlemen, as best as you can and
 5   we'll see how it comes down on the next one.
 6       All right.  Anything further from any counsel before we
 7   call it a day on this particular calendar and go to our next
 8   one?
 9       (No response.)
10           THE COURT:  No?
11           MR. WELLER:  No, Your Honor.
12           MR. CORRADO:  I hope you feel better.
13           THE COURT:  Appreciate your time.
14       I hope Mr. Weller gets over his ear infection and that
15   everybody has nice holiday.
16           MR. CORRADO:  Absolutely.  Happy holidays to you all.
17   Thank you.
18           THE COURT:  Okay.
19       (Proceedings adjourned.)
20
21
22
23
24
25
```

## CERTIICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, January 29, 2025