Pages 1 - 53

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Maxine M. Chesney, Judge

```
ALLAN WONG and JIMY RUIZ,        )
                                 )
            Plaintiffs,          )
                                 )
  VS.                            )   NO. C 3:24-cv-06776-MMC
                                 )
GlaxoSmithKline Consumer         )
Healthcare Holdings (US) LLC,    )
an agent of Haleon, a Delaware   )
limited liability company,       )
                                 )
            Defendant.           )
_____)
```

San Francisco, California
Friday, April 11, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

> CHARLES C. WELLER, APC
> 11412 Corley Court
> San Diego, California 92126
> BY:  **CHARLES C. WELLER, ATTORNEY AT LAW**

For Defendant:

> MORGAN, LEWIS & BOCKIUS LLP
> 1701 Market Street
> Philadelphia, Pennsylvania  19103
> BY:  **FRANCO A. CORRADO, ATTORNEY AT LAW**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
              Official Reporter, CSR No. 12219

```
 1   Friday - April 11, 2025                        9:04 a.m.

 2                        P R O C E E D I N G S

 3                           ---oOo---

 4        THE CLERK:  All rise.  This Court is now in session.

 5   The Honorable Maxine M. Chesney presiding.

 6        MR. WELLER:  Good morning, Your Honor.

 7        THE COURT:  Good morning.

 8        THE CLERK:  Calling Civil Case Number 24-6776, Jimy

 9   Ruiz, et al., versus GlaxoSmithKline Consumer Healthcare

10   Holdings.

11        Will counsel please step forward and state your

12   appearances for the record.

13        THE COURT:  This is off the record.

14            (Discussion held off the record.)

15        MR. WELLER:  Good morning, Your Honor.  I'm Charles

16   Weller on behalf of the plaintiffs.

17        THE COURT:  Very good.

18        MR. CORRADO:  Good morning, Your Honor.  Franco

19   Corrado from Morgan Lewis on behalf of Haleon, the defendant.

20        THE COURT:  All right.  So here we are with round two

21   of the complaint.  And I have a lot of thoughts here.  And I'm

22   not really sure where to begin because the last part of my

23   analysis is probably the more problematic one.

24            So there were a number of issues raised last time, as

25   you know.  One of them was whether or not the plaintiff had
```

1    pled enough to show that the product contained DL-malic acid;

2    in other words, an unofficial form of that, and I feel that

3    they have.

4         And the next question is whether it was used as a

5    flavoring as opposed to, for example, a flavor enhancer.

6         I don't know who wrote these regulations, but they

7    don't make our life any easier.  And in describing flavoring

8    agents and flavor enhancers, some of the words are, frankly,

9    synonyms of each other.  The only way that you can distinguish

10   between them, I think -- and I can hear from you on that if you

11   disagree -- the dividing line seems to be if whatever it is, is

12   used to impart itself a flavor; in other words, if it has a

13   flavor.

14        Now, so the defendant says, "Nobody buys fruit drops

15   tasting like malic acid," and I think that's true.

16        So what is the flavor here?

17        And the defendant -- I'm sorry, the plaintiff has to

18   explain flavors of what.  It's really a combination of sugars

19   and acids, and you move them around, and after you get through

20   doing that, you've got strawberry, or you've got berry, or

21   you've got -- I don't know, orange.  We'll just use orange as

22   an exemplar.

23        And so they're kind of the building blocks that create

24   a taste.  And so I am thinking -- let me see if I can find it.

25   I asked the clerk to bring things out, but then they're not

 1    quite -- here we go.

 2            I actually tried drawing a schematic, which I won't

 3    show you because it's embarrassing, but it has essentially,

 4    like, four circles, and I just labeled one of them "M," for

 5    malic acid.

 6            And so in a natural, let's say, fresh-squeezed orange

 7    juice, you would have these components, and one of them would

 8    be malic acid; and without it, you wouldn't have

 9    orange-flavored taste, is what the plaintiff says.

10            So then if you sub that out and you put in artificial

11    malic acid, maybe you are, in effect, putting something in then

12    that's necessary to make the taste; and it won't have the apple

13    taste or orange taste otherwise.

14            I wasn't quite clear -- and I guess I'll ask

15    plaintiffs' counsel this:  Are you saying that they just use

16    the concentrate, which is natural -- and nobody is disagreeing

17    that there's some of that flavoring in this product -- but then

18    they just made a bunch more that was cheaper by using DL-malic

19    acid?  Or did they actually change the original, I guess,

20    fresh-squeezed flavor -- well, concentrate flavor to taste more

21    like fresh-squeezed flavor, I guess?

22            I don't know if you know, but...

23            **MR. WELLER:**  Well, there is a lot to unpack there,

24    Your Honor.  I'll do my best.

25            First, we do not have the formula, so that's

1  something -- if we can --

2          **THE COURT:**  We don't have?

3          **MR. WELLER:**  We don't have the exact formula of the

4  product.

5          **THE COURT:**  Right.

6          **MR. WELLER:**  So we can -- we can draw assumptions,

7  make conclusions, but we have a lot of guidance from the

8  ingredient panel and from the testing we've done and from the

9  FDA regulations.

10          Now, the FDA regulations, they defined --

11          **THE COURT:**  So let's leave that out for just a second.

12  I just wanted to figure out -- if the answer is, "We don't know

13  exactly, but it's in there doing something that's changing the

14  flavor or affecting the flavor," I'm probably going to say you

15  have enough; all right?

16          Because every court that's looked at this has just

17  gone -- or almost every court, "We can't figure this out.

18  Let's just wait and see what happens."  And apparently nothing

19  has ever happened that ever gets recorded afterwards.

20          And have any of these -- and there's millions -- not

21  millions, but lots of malic acid cases.  You're just one of

22  many that jumped on the malic acid bandwagon.  For a while we

23  had the vanilla bandwagon.  Now we have the malic acid

24  bandwagon.

25          And has this not gone up to any circuit on malic acid?

1          Apparently not.

2          **MR. CORRADO:**  Not that I'm aware of, Your Honor.

3          **THE COURT:**  Okay.  So nobody really knows what's going

4   on here.  And I don't know what's happened in any of the

5   district courts after cases were allowed to go forward.  A lot

6   of them were thrown out.  Okay?  But some number were also

7   allowed to go forward.  And I don't know what happened to them

8   after that.

9          And a lot of courts have -- have gone on to say, sort

10  of:  Nevertheless, okay.  Let's just say it's in there.  It's

11  phony.  It's used as flavoring.  But whatever the defendant

12  said on the label, it's not misleading.

13         So that's the end of the discussion.

14         So they get past the point but then the case never

15  gets past that point.

16         So I'll just tell you, I'm inclined to let it go

17  forward as far as that part goes.

18         The "Is it used as a flavor?"  I got the idea of the

19  kind of components.  Here -- you can see I was drawing charts.

20  Anyway, they weren't very good.

21         But I thought, well, if they're leaving the

22  artificial -- I'm sorry, the natural in, but they want to make

23  it taste more like fresh-squeezed as opposed to concentrated,

24  maybe they're doing something with the malic acid that just --

25  I don't know, fiddles around with it in some way and you might

say, "That is an enhancer.  It is a flavoring."  It's hard to
tell.

Or if they just started from scratch and said:  Okay,
concentrate is more expensive than just making it.  Let's just
make it from scratch and add a bunch more of that in there.

Either way, some courts have looked at pleadings that
have said -- have actually given malic acid a flavor.  They've
just said it tastes like.

You have not done that.  You've kind of skirted that
idea.  You have "imparts," and you have, you know, various
words that don't really say, "It tastes like."  And it "can be
used to impart a tangy or a sweet flavor," which then could
just mean that, I don't know, maybe it's not being used as a
flavor itself, it's just in there to get the ball rolling in
some way.

So -- but I don't want to go through another
complaint.  If this -- if this lives past this point to get
another pleading and have just some minor tinkering with the
language, this is -- this kind of language that's been used
here has been looked at and kind of approved in the past.  So I
think you can make it clearer, but I don't know that I'm going
to require you to do it.

MR. CORRADO:  Your Honor, if I may be heard on the
point of whether they have plausibly alleged that it --

THE COURT:  You can, but there's a good chance I'm

1    just going to follow the herd on this, but go ahead.

2          **MR. CORRADO:**  So there's a couple of things, I think,

3    distinguishes this matter as well -- and I'll be brief.

4          **THE COURT:**  No, that's okay.  I mean, if you have a

5    really good point to make, make it.

6          **MR. CORRADO:**  The first thing is, you know, it's not

7    just to allege that the ingredient itself is an artificial

8    flavor under the regulation.  That's one thing.

9          **THE COURT:**  Well, that's for the characteristic

10    flavor.

11          **MR. CORRADO:**  Well, plaintiffs would need to also

12    allege that the ingredient is an artificial flavor that

13    simulates, resembles, or reinforces the characterizing flavor.

14          And Your Honor observed, the last time we were

15    together, that if you have a carrot and, you know, gravy, and

16    another ingredient and it makes beef stew, that doesn't make

17    the carrot beef stew.

18          **THE COURT:**  Right.

19          **MR. CORRADO:**  And I think that is an apt observation

20    for what we are here because plaintiff does try to and did try

21    to -- plaintiffs did try to flesh out how the malic acid

22    allegedly interacts with the ingredients here.

23          And they've said three things.

24          The first is, they've assigned a sweet-and-sour taste,

25    akin to apples, to malic acid.  There's no apple-flavored

1    product at issue here.  If you look at *Viggiano* -- now,

2    *Viggiano* dealt with whether a sweetener was a flavor.  But the

3    analysis holds true here.  What *Viggiano* said is that whatever

4    the ingredient is, it needs to actually give the flavor.

5           So if you step back and think through, if you remove

6    the malic acid from the products, it's still orange, it's still

7    tangerine, it's still raspberry, and there's four other flavors

8    at issue here.  It is all of those things --

9           **THE COURT:**  Wait a minute.  Start that sentence again.

10   If you remove the malic acid --

11          **MR. CORRADO:**  If you remove the DL-malic acid, even

12   under plaintiffs' allegations -- and it's undisputed because

13   the label itself lists the ingredients -- you still have an

14   orange-flavored product.

15          **THE COURT:**  Well, I'm not sure that you do.  That's

16   what I was trying to ask.  And what he's saying about that is

17   he just fiddling around with something that's going to retain

18   its essential flavor, or maybe a little more or a little less

19   of something, and you'll say, "That's just modifying.  It's an

20   enhancer.  It doesn't have a flavor of its own."  Okay.

21          Or is he saying that it is an actual component of a

22   whole new -- a whole new flavoring, if you will.

23          **MR. CORRADO:**  That's not the theory alleged.  The

24   theory alleged is, it taste like apples; and there's apple

25   product here.

1          **THE COURT:**  Well, not exactly.  I underlined that too,

2    but that's paragraph 59.

3          All right.  And at the very end, it says (as read):

4          "Malic acid gives food a mellower, fruitier,

5      sweet-and-sour taste akin to that of apples."

6          So we should get back to plaintiffs' counsel and say

7    why is he picking apples if apples isn't the flavor in the

8    orange drink?

9          **MR. CORRADO:**  And also, Your Honor, "mellower and

10   fruitier," even if you take those allegations as true, it can't

11   be interpreted within the auspices of that regulation to

12   simulate, resemble, or reinforce one of the flavors at issue

13   here.

14          That's -- in fact, those two terms themselves are

15   inherently inconsistent.  On one hand they're making something

16   less of something, and on the other hand they're making

17   something more of something.  It's a lot of gobbledygook that,

18   you know, I think you recognized last time just doesn't do it

19   when you're thinking about the regulations themselves.

20          And, you know, these other courts that have not

21   grappled with the language like you did last time, you know,

22   weren't also faced with the factual allegations that we have

23   here, which, taken as true, undermine plaintiffs' own claims.

24          And we've talked about that in the brief.  But even if

25   you take it as true, at best, at best it is an enhancer -- but

1    it's not even that if you take them as true.

2         And the courts dealt with it in conclusory fashion.

3         And, you know, I think, you know, I did make the point

4    before that Your Honor seized on that there's -- I don't think

5    there's any dispute that if you remove the malic acid, you

6    still have an orange-flavored product or a tangerine-flavored

7    product.

8         You have made the point that malic acid can't

9    possibly -- you have the action words within the regulations,

10   simulate, resemble, or reinforce.  How can one --

11      (Reporter interrupts for clarification of the record.)

12        **THE COURT:**  You are going a little bit fast.

13        **MR. CORRADO:**  You have the action words within the

14   regulations:  Simulate, resemble, or reinforce.

15        Plaintiffs haven't plausibly alleged how one

16   ingredient can do any of those things with respect to one of

17   the flavors, much less with respect to the seven different

18   flavors that are at issue here.

19        And, I think, finally, Your Honor -- and this may,

20   you know, help to crystallize it.  You know, I made the point

21   before that if you remove the malic acid, you still have an

22   orange product.  The converse isn't true.  If you remove the

23   orange, you don't have an orange-flavored product anymore.  I

24   don't know what you have.  I guess you have a mellow fruity

25   product that taste like apple.

```
 1              If you remove the tangerine, you won't have a
 2   tangerine product anymore.  Same thing for the raspberry.  Same
 3   thing for the kiwi strawberry.  Same thing for the six or seven
 4   other flavors that are escaping me.
 5              THE COURT:  I want to stop you.  What do you mean by
 6   "If you remove the tangerine"?
 7              MR. CORRADO:  So, you know, the regulations speak to
 8   flavors.  A flavor is an ingredient that imparts.  And taking
 9   it a step further, to be an artificial flavor for purposes of
10   the disclaimer, it needs to be one that imparts and also one
11   that simulates, resembles, or reinforces the characterizing
12   flavor.
13              THE COURT:  What do you mean by the start of your
14   sentence?
15              MR. CORRADO:  Oh, okay.
16              THE COURT:  In other words, are you saying you've
17   still got something that came out of an orange?  Are you saying
18   that there is something that exists as a unit called orange
19   flavor?
20              MR. CORRADO:  That's --
21              THE COURT:  What are you saying?
22              MR. CORRADO:  Yes.  So if -- on the ingredient
23   panel -- and this is not disputed -- there is orange juice from
24   concentrate as flavor.  There is tangerine juice as flavor.
25   There is raspberry juice as flavor.
```

1    **THE COURT:**  Okay.  So you're referring to the juice.

2    And what I gather the plaintiffs' counsel is saying,

3 "Okay, that juice is made up of a variety of sugars and acids."

4 In other words, if you play around with the composition of the

5 sugars and acids, you will get the -- one can taste like an

6 orange, one can taste like a strawberry, whatever.

7    **MR. CORRADO:**  I don't think so, Your Honor.

8    **THE COURT:**  Well, that's what he's saying is somewhere

9 in there.  And I'm just, you know -- I'm concerned.  We have

10 *Iqbal* and *Twombly*; right?  That's why we're all here.  In the

11 old days we didn't have *Iqbal* and *Twombly,* and all this got

12 sorted out in discovery.

13    Now, one of the reasons for *Iqbal* and *Twombly* is so

14 defendants like your client don't have to go through the

15 expense of discovering if somebody doesn't have a case in the

16 first instance.

17    But it seems to me the Ninth Circuit is getting more

18 and more sort of lenient and looking at complaints and saying,

19 "Let's wait and see."  And in other words, really not totally

20 applying in a strict way at least *Iqbal* and *Twombly*.

21    And so if we look at this, I think that the pleadings

22 here fall into what a lot of courts have just said, "Let's

23 wait."  All around the country, "Let's wait."

24    And one could take a very strict view, then counsel

25 can take it up, and maybe we'll get it, you know -- a circuit

 1  opinion on all of this on malic acid and either put it to rest

 2  one way or the other.

 3          But I do understand that he is saying it isn't one

 4  thing.  There's nothing that's just "orange-flavor."  Orange

 5  flavor is made up of components.  And if you sub out, for

 6  example -- which it isn't clear he's saying that, but let's

 7  just say you sub out one of those components and you plug in an

 8  artificial version of it.  Have you then an artificial flavor

 9  if part of what makes the flavor is artificial.  Does that then

10  contaminate the so-called natural ingredients, and you now have

11  an artificial flavor?

12          That's possible.  It isn't clear that's what's going

13  on here because, as you say, you've got some that isn't

14  tampered with.  And that's why I was questioning whether

15  counsel is saying somebody is then taking that and changing it

16  in some way, which may or may not then count as a flavor -- I'm

17  not sure even then.

18          Or whether it is making more of the original stuff and

19  just making it using cheaper ingredients, if you will; in other

20  words, some sugars and then some acids.  And then, when you get

21  to the malic acid, let's just use this fake one and mimic, if

22  you will, a natural orange flavor.  You essentially engineer an

23  orange flavor, you know.

24          MR. CORRADO:  The business about, if I may, there

25  being no such thing as a flavor -- no such thing as a

1    strawberry flavor or an orange flavor -- is not something that

2    really captures what the regulations are talking about.  This

3    sort of abstract notion of all tastes being a balance between

4    sugars and acids isn't what the regulations say.

5         The regulation doesn't say if it is an ingredient that

6    modifies the balance between acid and sugar, it is an

7    artificial flavor.  The ingredient talks -- I'm sorry, the reg

8    talks to an ingredient that does one of three specific things

9    to characterize the flavor.

10        If you accept plaintiffs' view of this balance of

11   acids and, you know, this -- the balance argument, the ratio,

12   then any ingredient in a product that affects how it tastes

13   becomes a flavor.  And that's not what the regulation says.

14   The regulations recognizes that there's flavors, there's

15   sweeteners, et cetera.

16        But if you add a sweetener to a product, that changes

17   the balance of sugar; right?  It adds sugar.  Under plaintiffs'

18   view, that sweetener would then become a flavor.  And if it's

19   an artificial sweetener, it would become an artificial flavor.

20        So, you know, respectfully, Your Honor, I understand

21   these other courts have not grappled with the regulation in the

22   same way, I think, under the circumstances here, with the

23   allegations here, with the panoply of different ingredients

24   and -- I'm sorry, flavors that we're dealing with here.

25   Plaintiffs undermine their own case in the way that they've

1  pled it.

2       **THE COURT:**  Okay.  Well, let me -- let me go back

3  apropos of what you said.  Let's assume that you don't look at

4  components then; in other words, your view is, however you get

5  there, you've got something that tastes like an orange.

6  All right?

7       And if you don't have something else that's made up

8  essentially either of the same components or something that

9  works the same way and itself tastes like an orange, it's not

10  an artificial flavor.

11      Would that be fair to say?

12      **MR. CORRADO:**  Can you repeat that one more time?

13      **THE COURT:**  Sure.

14      Okay.  In other words, you -- your analysis, I

15  think -- and I'm not saying this is wrong, but your analysis

16  is:  Let's not worry about how you create an orange flavor.

17  Ultimately, you have an end result orange flavor; right?  Okay.

18      **MR. CORRADO:**  Partially.

19      **THE COURT:**  And then, if you want to add something

20  that is going to count as a flavor, and count as the

21  characteristic orange flavor but be artificial, it has to be

22  something that itself tastes like an orange?

23      **MR. CORRADO:**  Correct, Your Honor.

24      **THE COURT:**  Okay.  And that's an interesting point and

25  maybe you're right.  Let's think about it.  Okay.

1    So under your theory, you have the natural orange

2  flavor in the -- one of these beverage additives, and then you

3  create yourself a whole new one that tastes like orange,

4  however you make it; okay?

5    You put a little of this, a little of that, and it's

6  all -- you make it and it isn't all coming -- whatever you're

7  using didn't all come from fruits and nuts and things that grow

8  in the ground, okay, and then you put that in.

9    Now, that was sort of one of the questions that I was

10  asking of plaintiffs' counsel.  In other words, are you saying

11  you've got orange that's naturally created and then you

12  engineered a whole other orange that tastes just like it or

13  pretty much like it, it is close enough, and it's cheaper than

14  squeezing it out of an orange or a bunch of oranges.  I'm not

15  sure how you make concentrate, I might ask you that.

16    But anyway...

17    **MR. CORRADO:**  Right.

18    **THE COURT:**  So that's why I was asking if you're just

19  making it from scratch or you're playing around with what's

20  already there that doesn't really itself have an orange

21  flavor -- it may have some kind of flavor, but it's not what

22  you're advertising the product to be.  Okay.

23    **MR. CORRADO:**  Your Honor, I think that is the only

24  logical way to interpret the regulation, and that's exactly

25  what we walked through back in December, the last time we were

 1   here.

 2        **THE COURT:**  Okay.  But that -- just so I have your

 3   argument clear.  Okay.  So then we get back to plaintiffs'

 4   counsel who says, "Well, we haven't really, you know, done any

 5   testing on it so we don't really know what they're doing in

 6   there."

 7        What would you have to say to Mr. Corrado's argument,

 8   Mr. Weller?

 9        **MR. WELLER:**  A lot of this comes down to food science.

10   And the food science is -- it's not my view, it's not

11   plaintiffs' view, it's the scientific community.  And we have

12   bolstered these allegations with -- with quite a few scientific

13   references on how fruit flavors are made.

14        **THE COURT:**  Yeah, let's assume you have.  Okay.  The

15   question is this:  Have you pled anywhere that the malic acid

16   that's being used is actually -- in other words, that you've

17   created with malic acid a whole fake orange flavor that you've

18   put in with whatever the natural is so that you have more of it

19   in the product but it's cheaper to put it in that way?

20        **MR. WELLER:**  Yes.  By replacing the malic -- L-malic

21   acid with DL-malic acid, you can simulate that orange flavor.

22   And then by adjusting the ratio between those acids and sugars,

23   you can -- you can resemble a different flavor.

24        For instance, in this case there's no -- their flavor

25   is not called orange.  It's called super orange.  So super

1   orange to the consumer may mean it's orangier than regular

2   orange.  So they dial up that flavor.  And the way you would

3   dial up that flavor is by that ratio.  If you look at

4   paragraph 58 -- 55, excuse me, of the amended complaint, this

5   is how the fruit flavors are made.

6           And in terms of the malic acid, the malic acid is

7   importing flavor -- if you look at paragraphs 52 and 57 in

8   these products --

9           **THE COURT:**  You say it's added to give them a sweet

10  and tart taste but you don't say that -- I just have a problem,

11  like I said before -- let me look at 57.  These are all ones

12  that I have looked at and made a note of in the 50s.

13          You say "it is associated with."

14          "It helps to create in some way."

15          **MR. WELLER:**  Correct.

16          **THE COURT:**  But --

17          **MR. WELLER:**  And because of the use of the DL-malic

18  acid, that's why the artificial flavor disclaimer is required.

19  And we walk through that -- in terms of defendant's products

20  paragraphs 69 through 77, we walk through how that's done on

21  this product, how --

22          **THE COURT:**  Let's see.  Let's look at 69.  That's

23  another one I flagged.

24          **MR. WELLER:**  Okay.

25          **THE COURT:**  Quote (as read):

1          "The combination of sugars and artificial

2     DL-malic acid in defendant's products is engineered

3     to resemble the natural ratio of sugars."

4          That may be the closest you've got.  Let me go back to

5     that one for a minute.

6          All right.  Quote (as read):

7          "In this case, the combination of the sugars and

8     artificial DL-malic acid in defendant's products is

9     engineered to resemble the natural ratio of sugars

10    and natural L-malic acid that make up the natural

11    flavor of the characterizing fruit."

12         Okay.  And then it goes on to kind of almost say

13    that's not what it is.  But okay.

14         What was your other one that you wanted me to look at?

15         **MR. WELLER:**  And then 71 --

16         **THE COURT:**  Okay.  And --

17         **MR. WELLER:**  -- we go on to allege why the DL-malic

18    acid itself is a flavor.

19         **THE COURT:**  (as read):

20         "By creating taste perceptions that resemble

21    those of natural fruits and reinforcing those fruit

22    flavors to make them mellower and fruitier, instead

23    of sharper or more sour as they would be naturally,

24    it's a flavor."

25         Now, I don't necessarily agree with that.  I think you

start getting into problems the minute you start trying to figure out what verbs you ought to use from these regulations. Because flavor enhancers are, quote (as read):

"Substances added to supplement, enhance, or modify the original taste and/or aroma of a food without imparting a characteristic taste or aroma of its own."

Characteristic taste.  Not apple flavor, not some sweet flavor or sour flavor, characteristic flavor, i.e., the end result orange we're using.

Okay.  Then you get into problems where they start going flavor reagents and adjuvants.  Quote (as read):

"Substances added to impart or help impart a taste or aroma in food."

Starts overlapping quite a bit with modify, enhance, supplement.

So the only way that there's a distinction is because for flavor it's got to have its own characteristic flavor. Otherwise these things use different words that mean the same thing, or could.

So I think that your best shot is not to rely on that one you called my attention to, but 69.  69 is probably your best.  The minute that you start saying it is adjusting things, you're getting into modifying and either making it sweeter or tarter, but not saying that it itself.

1          So the best that I think you've got is where you say

2     that you've engineered something that resembles natural orange

3     flavor.  You haven't said it that clearly but that's close, and

4     that, I think, is the best you're going to say.

5          Because as I was saying before, it's really -- you

6     have an end product, orange flavor, however you got it,

7     natural.  Okay.  It's made up of a bunch of stuff and it ends

8     up -- people perceive it as associated with oranges, okay, the

9     fruit.

10         Then, if you just fiddle around with it, but whatever

11    you put in there doesn't itself taste like oranges, i.e., malic

12    acid alone, that's probably not going to work.  You almost have

13    to say that you have made a whole new orange flavor, some of

14    which is made up of something artificial.

15         All right.  So it really is kind of a misnomer to say

16    malic acid is using -- is the flavor.  It's that it is a

17    component of an engineered flavor.  Okay.

18         And you are kind of saying that along the way in

19    various ways.  But, again, I think your best bet is 69, if you

20    want to rely on anything.  When you start backing away from

21    that, I think Mr. Corrado is going to pick up on all kinds of

22    things that are not necessarily ending up with a whole new

23    orange flavor.

24         So you got the real one here and we know it's there;

25    all right?  And even if somebody throws malic acid in to make

1     it a little less concentrated tasting or whatever, that itself

2     might not be a flavor.

3         But if they're actually making new orange flavor and

4     part of how they make it in the lab is with some phony

5     ingredient, I'll just call it, then you'll might be then

6     creating an artificial flavor, which is now in the product and

7     now you've got natural and you've got artificial.  And if any

8     of it is artificial, you're supposed to say artificially

9     flavored.  But we haven't gotten to that issue yet.  Okay.

10     **MR. CORRADO:**  And that's not the theory, Your Honor.

11     The theory you just walked through is not what's pled in the

12     complaint, even --

13     **THE COURT:**  Well, 69, read that again.

14     **MR. CORRADO:**  I understand that --

15     **THE COURT:**  That's the closest as he's got.

16     **MR. CORRADO:**  But --

17     **THE COURT:**  That the combination of sugars and

18     artificial DL-malic acid is engineered to resemble the natural

19     ratio of sugars and natural L-malic acid.  All right.  So that

20     it tastes like the natural flavor.

21         Now, it can't all be because then you would have

22     destroyed your idea that everybody seems to agree there is some

23     natural-source orange flavor in there.

24         So it's only a question of if there's more of the same

25     in effect.

1      **MR. CORRADO:**  I think 69 is conclusory in that

2  fashion, Your Honor.  And where plaintiffs fumble the ball is

3  where then they try to, you know -- well, is it resemble?  Is

4  it reinforce?  Is it simulate?  When they try to apply it to

5  the regulation, their whole case falls apart.

6      **THE COURT:**  Well, you know, I think the minute that

7  you get away from 69, you are getting a lot closer to enhancers

8  and to not being a flavor that is the characteristic flavor.

9  Because malic acid, nobody says it tastes like oranges.  Okay.

10      And apparently no particular acid tastes like orange.

11  No particular sugar tastes like orange.  You have to put them

12  together in a mixing bowl and then you come out with something

13  that tastes like orange.

14      So I hadn't really thought about it, like,

15  butterscotch, okay.  There's no butterscotch plants or

16  anything.  It's got to be made up.

17      And the question is:  Are the ingredients that you

18  make it up with natural?  Did they come from, you know, C&H

19  pure cane sugar from Hawaii, or did somebody create some phony

20  sugar-flavored thing?

21      Then you have just:  Let's all make it with stuff that

22  kind of tastes like the real stuff, but we'll just all concoct

23  it in the lab.

24      And so I think the question is whether they've got the

25  real stuff in here and they're concocting a whole new one that

1   goes in with it.  Then you can say, "We made up a flavor that's

2   fake, and you've got the natural but you have this flavor too,

3   and there you go."

4        But just saying malic acid is in there to fiddle

5   around with the real stuff probably won't do it because it

6   itself is never a flavor.

7        The real end result is:  Have you made a flavor in

8   there?

9        Now, I can't believe that nobody has tested any of

10  this in the many cases that they have had.  Does anybody know

11  what happens to these things after these kindhearted judges

12  say, "Oh, let's let it go forward"?

13       **MR. WELLER:**  Your Honor, we --

14       **THE COURT:**  It's a bad question.

15       **MR. WELLER:**  No, we've tested it.  I'm not clear what

16  you referred to as "testing."

17       **THE COURT:**  Well, you tested to find out if it has DL

18  in it --

19       **MR. WELLER:**  Correct.

20       **THE COURT:**  -- and it does.  Okay.  Fine.

21       I think you've done enough to plead that it has

22  DL-malic acid.  The question is:  What are they doing with it?

23  How is this product actually composed?

24       And that is something that -- with all these cases

25  that have been out here for a number of years now, has nobody

1    ever really figured out how this stuff is being used?

2        **MR. WELLER:**  As I alluded to earlier, I don't think

3    it's possible without knowing the full formula, that's for

4    discovery.

5        **THE COURT:**  All right.  These are cases that went to

6    discovery.  The judges said:  All right.  We're not going to

7    try and kill it off now, it's too confusing.  Let's just say

8    that we'll let it go and we'll see what happens.

9        And then has nobody seen what happened afterwards?  I

10   just can't believe this.

11       **MR. CORRADO:**  And that has allowed these cases to

12   propagate in a way, you know, that I think misses the point of

13   the regulations, for all that we've talked about.  I think

14   Your Honor had it absolutely right in December, and I don't

15   think plaintiffs have done anything to rehabilitate that.  And

16   69 doesn't do it because 69 doesn't tie their allegations back

17   to the regulation and they --

18       **THE COURT:**  They will --

19       **MR. CORRADO:**  -- they cannot explain how it satisfies

20   the regulation.

21       **THE COURT:**  Well, I don't think they have to.  I mean,

22   they can plead a fact and I can read the regulation.  They

23   don't have to argue their opposition, so to speak, in their

24   complaint.

25       But I should have brought out the original complaint.

1    Was 69 in some form in the original complaint?

2        **MR. WELLER:**  Your Honor, we have -- we have changed so

3    much of this that I do not know the answer to that, to be

4    honest.

5        **THE COURT:**  Not sure.  All right.  I mean, I have done

6    quite a bit of thinking about this since and it really makes

7    your eyes just cross.  But I think people that write these

8    regulations are not English majors, you know.  Whoever is doing

9    it doesn't really always make our life easier.  But I got very,

10   very much involved in this whole new idea when the case first

11   came in.  What's going on here?

12       Then I tried to simplify it for myself in the

13   intervening period.  And I have -- I -- I think I'm still right

14   about what I said before.  It's just a question of whether or

15   not you have pled that they've actually created a whole

16   artificial flavor using malic acid.  They could have used a

17   variety of ersatz components.  But if one of them that you know

18   is in there is malic acid, it isn't that malic acid is a

19   flavor; it is, at best, a component of an engineered flavor.

20       And if that's what happened -- and how you're ever

21   going to know this I'm not sure.  You say you need the formula,

22   well, the defendant has it.  Okay?

23       And at some point -- I don't know how it's going to be

24   imparted to you, if it's like the Coca-Cola formula or

25   whatever, but they know what's in there.  And at some point if

1    this case does go forward, you're either going to be proved
2    right that they've actually created, along with the natural
3    orange, a whole fake orange flavor -- all right? -- not called
4    malic acid, called artificial orange.  Okay?  Engineered
5    orange, if you want, versus fresh-squeezed orange.  And then if
6    that's what they did, you may be right.  And if they didn't do
7    that, you're going to be proved wrong.
8            And I just can't believe nobody has done this up till
9    now.  It's surprising because some of these cases, I think,
10   have gone forward.  A lot of them are killed off at step two,
11   which is, okay, even if you have pled enough, comes the next --
12   putting it bluntly -- so what?
13           And the "so what" is, has anybody been led to believe
14   that it wasn't in there?  That there are no artificial flavors?
15   And that's the next step.  And, you know, the guillotine came
16   down on a lot of those cases at that point.
17           And some have been allowed to go forward for a variety
18   of reasons, and we can talk about that.  But I wish I had
19   double-checked to see if 69 was in -- as intact in the original
20   complaint.
21           But I really hadn't done my little chart and figured
22   out kind of the concept either.  I had a kind of gestalt about
23   it, but I couldn't quite articulate it.
24           So -- okay.  I do want to quickly touch something
25   before I forget.  There are two motions.  One is a motion to

 1   strike, one is a motion to dismiss.

 2        We are currently talking about the motion to dismiss.

 3   The motion to strike is to strike from the amended pleading --

 4   I'm looking for the motion -- anyway.  A declaration from an

 5   expert.  I'm granting that motion.

 6        But to the extent that the content has been described

 7   or something similar to the content has been described in the

 8   complaint, that's fine.  This is more just of a procedural

 9   matter, and I think the defendant is right about the motion to

10   strike.  So that's granted.

11        It's strange, I had all these things set up out here.

12   Give me a second.  Maybe it's in this stack.

13                  (Pause in proceedings.)

14        **THE COURT:**  So we're now back to the motion to

15   dismiss.  I just didn't want to forget that.

16        All right.  I think we should go to the next issue

17   which is the language used.  And I have tried, with the help of

18   chambers staff, to sort of tone up the various cases on the

19   various types of language used.

20        It seems to me that the language used here, which is,

21   no -- I'm sorry, which is natural orange -- let me get it

22   exactly so we have it in -- here.  And there may be variations

23   of sorts, but -- okay.

24        So on the super orange, it says "super orange" and it

25   says "flavored fizzy drink mix with natural flavors."  Okay.

1    Words essentially -- oh, and I'm sorry, also a circled

2   three words "natural fruit flavors."

3    And that's pretty much emblematic of what we've got in

4   the various products, I guess.  I've been pretty much just

5   focusing on the orange.  Whether any of these other fruit

6   flavors fall by the wayside and orange goes forward, I'm not

7   really in a position to say.

8    But that language has generally been, with very rare

9   exception, found not deceptive.  And as contrasted with --

10  there are some number of cases that have said "naturally

11  flavored," in other words, talking about how the product was

12  flavored.

13   And some don't feel that -- well, there's some cases

14  that say, "That's okay," but they're kind of in the minority.

15  Most of the "naturally flavored" cases have gone against the

16  plaintiff.

17   But I don't know, I think -- I only found, I think,

18  one "natural flavor" case that actually went forward on natural

19  flavor and that was *Adams V Kraft.*  Did anybody cite that?  I

20  can't remember.  It's not a malic acid case.  Or wait, it might

21  be.  Hang on.

22    **MR. WELLER:**  I'm sorry, Your Honor.  Can you repeat

23  that?  You said you only found one case --

24    **THE COURT:**  I only saw --

25    **MR. WELLER:**  -- to allow a claim such as "naturally

1   flavored" to go forward?

2       **THE COURT:** No, "naturally-flavored" is not what's on

3   your label.

4       **MR. WELLER:** Yes.

5       **THE COURT:** All right? There are a few "naturally

6   flavored" that have gone forward, but many "naturally flavored"

7   haven't even gone forward.

8       You have something that isn't even as good as

9   "naturally flavored." You have "natural flavors." And under

10  those circumstances, I think I only found one case. And let me

11  just grab that quickly, because I have it here.

12      This is sort of the plaintiffs' best case. It's not

13  under any of the California statutes. It's out of Florida.

14  But I'm trying to find where I have it. Yes. In that case it

15  was "natural flavor with other natural flavors."

16      Okay. And they had -- they had some kind of flavoring

17  in something called an M-I-O brand. I don't know, I'm not

18  familiar with it. Maybe they sell that on the East Coast

19  somewhere.

20      **MR. WELLER:** Yeah. I believe that's a water enhancer.

21      **THE COURT:** Okay. So the court there -- that one they

22  did let go forward on it. And combined with the -- essentially

23  the question about not including the -- what under regulations

24  if it has an artificial flavor, the required disclosure, in

25  other words. But they seem to look at both together and

1    separately.

2          And that's really, in my view, the best case for the

3    plaintiff because it went in favor on "natural flavor" being

4    considered deceptive, and said you could also throw in this

5    idea of the omitted "artificially flavored" proviso or warning

6    or whatever you want to call it, disclosure, I guess.

7          But they seemed -- and it's fairly recent, it's from

8    '22.  I couldn't -- let me just see if anybody else talked

9    about it or how I got my hands on that.

10          **MR. CORRADO:**  Your Honor, I believe that's cited in

11    plaintiffs' opposition and we addressed it in our reply brief.

12          **THE COURT:**  Okay.  But that's one case.  Okay.  The

13    bulk of the cases, frankly, are going against the plaintiff on

14    the idea if it's just sitting there by itself, naturally --

15    "natural flavors" doesn't mean that there are no artificial

16    flavors of the characteristic sort.

17          But the question that I have in my mind about this is,

18    what is the effect of the failure -- if there is an artificial

19    flavor, we'll just say if there's artificial orange in

20    Emergen-C.

21          For the reporter that's E-M-E-R-G-E-N, hyphen, C, big

22    capital C.  Emergen-C.

23          For example, if there is artificial orange flavor in

24    Emergen-C, then the defendant, as I read the regs, was supposed

25    to put "artificially flavored," or words to that effect, on

1    their label.

2         And a number of cases have said, "Oh, well, that's

3    regs, who cares?  That's for the agency to deal with.  There's

4    no private right of action under it, so we just don't consider

5    it."

6         Some cases like *Adams*, have said, "Well, it's okay to

7    consider that."  Also -- I don't know that you have cited the

8    second *Brown* case.  The first *Brown* case said that on that

9    issue the plaintiff hadn't pled enough to show that you could

10   consider whether -- or find reasonably that a reasonable

11   consumer would rely in some way on that absence of a

12   disclosure.

13        Then they came back -- the plaintiff came back and in

14   the second of the *Brown* cases, which I don't think any one of

15   you mentioned, but let me give you the cite on it -- because

16   what I'll call *Brown* one, which was from 2019, out of the

17   Southern District, definitely went the defendant's way.

18        What I'll now call *Brown* two is the following:  It's

19   later in the year, 2019, Westlaw 4183936.  Judge Jeffrey

20   Miller, who said, "Okay.  You've pled enough now."

21        Now let me tell you what he thought "enough" was.

22        Quote (as read):

23        "Consumers did not know the product contained

24        artificial flavoring ingredients due to defendant's

25        omission of the legally required artificial flavoring

1    disclosure."

2           Okay.  And the court goes, "Well, I'll accept that."

3    They did say it's pretty slim but they accepted it.

4           Now, that's one case that you can say went the

5    plaintiff's way on what is the significance of the omitted

6    disclosure.

7           Another case that we have is *Adams*, as I mentioned.

8    That's malic acid, but in -- not in these kind of -- not in

9    exactly the same product we have but similar.

10          And then we have -- *De La Cruz v. CytoSport* that

11   likewise went that way, perhaps not as clearly, but let me get

12   that one.

13          That's from Judge Wilken, but it's about 15 -- oh,

14   yeah, 13 years ago.  And she had a -- I guess some kind of a

15   bar -- no, it's a drink, Muscle Milk Ready-to-Drink, whatever

16   that is.  And the defendant just larded up their label and --

17   with a million different adjectives and other things that made

18   it sound like it was very healthy.  And the plaintiff said:

19   It's got a bunch of things that are bad for you in it.

20          Then the judge got to the labeling regulations, and a

21   lot of times when courts look at these, they aren't looking at

22   exactly the one we're dealing with.

23          And the judge said, quote (as read):

24          "The FDA regulations may lend objective criteria

25       by which to determine whether certain words and

1    phrases used on the label are misleading."

2         I'm not quite sure exactly where that fit into the

3    extent the defendant was trying to say it was preempted, that

4    you couldn't bring a claim alleging that, she said, no.

5         But I think *Adams* and *Brown* were the strongest to say

6    that you can consider the regulations.

7         So a few other courts have looked at it.  And, for

8    example, *Griffin* is a case where the court said, "Well, you

9    haven't pled enough."  And they did give the plaintiff leave to

10   amend, and then I don't know what happened there.

11        But *Boss v. Kraft Heinz Company*, which is a very

12   strong statement that these regulations add nothing, forget it,

13   it's off on its own side somewhere, nothing to do with the

14   case.

15        Then you have, I think it was in *Nacarino*, that was a

16   vanilla case and that's Judge Chen, I believe, from our

17   district, who said, "You can't use it alone."

18        Now, what does that mean?  All right.  If it's not

19   enough to say "natural flavors" is deceptive, is the failure to

20   include the disclosure "artificially flavored" just out there

21   on its own?  Or could you say the following, if you have a weak

22   starting point, does the lack of disclosure give you enough to

23   make a viable case?

24        We're back to components; okay?

25        So if you have one component that is just a really bad

1    label that's going nowhere ever, nobody thinks there's a

2    problem with it, you're not going to be able to rely on the

3    regulation.

4         If you have one that's maybe borderline, could you add

5    the regulation in to now make -- not orange flavor but a viable

6    case?

7         Or do you have to have a viable case to start with on

8    the label and this just makes your case better?

9         In other words, all of that -- it's sort of an

10   enhancer.  All right.  So do you have a pleading enhancer, or

11   do you have essentially a pleading, a viable pleading?

12        So it's kind of the same idea.  And I'm not sure what

13   the cases that would come down on -- again, these are all

14   district courts just trying to do their best with this area.

15        The only court, I will say this -- and I am talking a

16   lot, but that's because I spend so much time looking at this,

17   and I really am tired of reading about malic acid -- because

18   personally I don't care about it.  And I don't drink these kind

19   of drinks, and I'm not trying to find the most natural thing in

20   the world.

21        But the *Barreto* case -- and, again, I can't remember

22   if you folks cited that, but let me just say what the cite is

23   just in case you didn't.  You probably did.  It's *Barreto*

24   *v. Westbrae Natural*, out of the Southern District of New York

25   in 2021 --

1              **MR. CORRADO:**  We cited that in our brief, Your Honor.

2              **THE COURT:**  You have that, good.

3          So *Barreto* relied on the Second Circuit, who had

4    looked at kind of the issue -- not in our particular area of

5    the law but in looking at where regulations fit in.  And there,

6    in quoting the Second Circuit under their kind of consumer

7    protection law, the Second Circuit in a case called *Nick's*

8    *Garage, Inc*, so it has nothing to do with food cases, said that

9    their local protection law, quote (as read):

10             "Is viable" -- "the claim is," quote (as read):

11             "viable where the plaintiff makes a freestanding

12        claim of deceptiveness under that statute, that

13        happens to overlap with a possible claim under

14        another statute that is not independently

15        actionable" -- all right -- "but fails where the

16        violation of the other statute by conduct that is not

17        inherently deceptive, this claim did constitute a

18        deceptive practice that serves as the basis for the

19        consumer protection law."

20         I wasn't sure what they meant.  And I tried to read,

21    then, *Nick's Garage.*  And I think they basically just were

22    saying in that case, you -- if the actual behavior that

23    violates the consumer protection law as deceptive also violates

24    some other regulation, you can throw that regulation in.  But

25    it -- it -- if it doesn't violate initially, this isn't going

```
 1    to help.
 2            But I'm not sure about that, and so I'm just saying
 3    maybe somebody wants to look at other circuit law or any
 4    circuit law, but I couldn't find any that was --
 5            MR. CORRADO:  Your Honor --
 6            THE COURT:  -- on the point.
 7            MR. CORRADO:  -- we also cite the Victor case,
 8    Victor v. Bigelow.
 9            THE COURT:  Victor, if you want to -- let me pull
10    Victor and -- sorry.  You did cite Victor.
11            Okay.  And as I said, there are cases that just say --
12    it's not going to work, so let's go to star 8 -- 17, I think,
13    is that where you're looking?
14            MR. CORRADO:  Yes.
15            THE COURT:  Okay.  Let me just get up there.  Okay.
16            Well, they say that -- this is funny, I was wondering
17    if anybody was British because it sounded kind of British.
18            Quote (as read):
19            "A statement may technically violate some law
20        that a reasonable consumer may have no dashed
21        expectation about it."
22            That just sounded like something somebody in the UK
23    would say, not here.  But anyway...
24            So then it goes on, though, and says (as read):
25            "Victor does not explain how this statement was
```

1    either false or misleading to a reasonable consumer."

2         It almost sounded like this plaintiff just didn't

3    plead anything much.  And then they say, quote (as read):

4         "While regulatory violations may suggest that" a

5         statement -- that, I'm sorry -- "statements might be

6         misleading to a reasonable consumer, that alone is

7         not enough to plead a claim under the FAL, CLRA, or

8         the misleading false advertising prongs of the UCL."

9         And then it cites *Trazo*.  And -- lastly the Court says

10   (as read):

11        "The ultimate question is what a reasonable

12        consumer expects, which may have absolutely no

13        relation to the FDA regulations."

14        And then -- that was Judge Orrick and -- I'm trying to

15   remember if -- I think he was citing *De La Cruz* --

16        **MR. CORRADO:**  He was citing *De La Cruz.*

17        Your Honor -- and I know we've taken up a lot of the

18   time this morning.  I think, you know, the one consideration

19   with respect to whether the alleged omission of "artificial

20   flavors" can be deceptive is tied in a lot of ways to the first

21   argument, whether or not the packaging itself suggests

22   exclusivity.

23        Because there's -- as *Victor* has held and other courts

24   have explained, the absence of the "artificial flavors"

25   disclaimer has no independent reason -- meaning to a reasonable

consumer.  So the question is:  Well, was there something about

the product packaging that rendered it misleading by omission?

Did the defendant say anything that suggested there was no

artificial flavors, therefore, the omission of artificial

flavors was deceptive?

And if Your Honor agrees with the majority of courts

that natural -- I'm sorry, "with natural flavors" doesn't

suggest exclusivity, then the other side of the coin is:  Well,

then there's no reasonable expectation of exclusivity, and,

therefore, "artificial flavors" isn't deceptive.

And in this particular case, which is different than

some of the other cases cited that you've discussed, there are

disclaimers on the product packaging that further remove from

the realm of reasonableness any conclusion that the product

didn't have artificial flavor, that's like caffeine-free,

gluten free.

**THE COURT:**  Well, the plaintiffs want to use that to

say everything that you said was free is on there.  Well,

you're saying -- I'm sorry, you're saying that we've listed

everything --

**MR. CORRADO:**  It's the other side; right?

So what they're saying is, well:  I would have assumed

it's in there -- right? -- because you didn't say "free."

Well, then you couldn't have taken any meaning away

from the absence of an artificial flavors disclosure.

1        **THE COURT:**  Wait a minute.  Let me go back.

2        **MR. CORRADO:**  I think -- let's hit reset on that one.

3        **THE COURT:**  All right.  You listed a number of things

4   that weren't in there.  And so the plaintiff is arguing,

5   I believe, that since you didn't say there are no artificial

6   flavors, it led the plaintiff to believe that there were no

7   artificial flavors.  Because when you wanted to say what wasn't

8   in there, you said it, and you didn't say this one, and I think

9   that -- plaintiff, were you relying on that?

10       **MR. WELLER:**  No, we completely disagree with this --

11  with this line of reasoning.

12       **THE COURT:**  Oh.  Okay.

13       **MR. WELLER:**  And, Your Honor, I'll tell you why.  What

14  opposing counsel is doing here is not what consumers do, being

15  hyper-grammatic, parsing out labels piece by piece.  You walk

16  in a grocery store, there's 50,000 products, you have a tenth

17  of a second to make a little purchase decision.  You look at

18  the label as a whole.  And we cited to scientific research on

19  how consumer behavior works when they're looking at these

20  labels --

21       **THE COURT:**  Okay.  If they care about --

22       **MR. WELLER:**  -- when they're making purchase

23  decisions --

24       **THE COURT:**  -- natural flavors, if they really care

25  about them, then they are looking at these labels.

1          **MR. WELLER:**  Right.  And the label says the word

2     "natural" on it no less than five times.

3          **THE COURT:**  But not -- okay.  Here's the thing.  I'm

4     not buying "natural flavors with other flavors" or "natural

5     flavors" is alone deceptive.  Okay?

6          I'm going to go with all those majority of cases that

7     say, no, it doesn't lead one to believe that there are only

8     natural flavors in the product.

9          Now, you might say it isn't as bad as some of the

10    cases where all it did was say "flavors" and had, like, a

11    picture of a fruit on it or something, which I think those are

12    dead in the water to start with.

13         But this case you might argue is kind of borderline in

14    that if somebody actually was looking for these artificial

15    flavoring disclosures, then maybe that would be enough to

16    create an engineered viable claim instead of a natural one.

17    Natural one being one that says "all natural flavors, a hundred

18    percent natural," or whatever.

19         However, I don't think the plaintiff has really pled

20    enough, even if this is something that can be pled.  There are

21    some cases that almost from their language suggest there's no

22    way you can make this work.  It's out of the picture.

23         Others seem to at least leave something of a door

24    open.  And some really swung it open and said, okay.

25         But I think there has to be something more than here.

1    And let me go for a minute to the one paragraph that is the

2    only really pointed paragraph on this.  I think it's 81, but

3    give me a second.

4              Yes.  All right.

5              In paragraph 81, plaintiffs, who are now taking

6    themselves out of the realm of the slapdash purchaser you've

7    described, have alleged, quote (as read):

8              "Plaintiffs reviewed the labels on the products

9         prior to their purchases."

10             All right.  (as read):

11             "And reviewed the flavoring claims made on those

12        labels."

13             So this isn't:  Boy.  I'm in a hurry.  I've got to get

14   out of here.  The kid is getting back from school.  Grab

15   something that says "natural" and run home.

16             All right.  It goes on (as read):

17             "Plaintiffs reasonably understood defendant's

18        natural flavors and natural fruit flavors statements

19        as well as its failure to disclose the use of

20        artificially derived malic acid to mean that the

21        products contain only natural flavors."

22             Now, that is the only paragraph that I found that

23   suggests that possibly consumers may be alert to this.  The

24   prior paragraph just says regulations create reasonable

25   consumer expectations.  Maybe they do, I don't know.

1          They at least make one think, I guess, that people

2     can't put terribly bad things in products.  But after that, I'm

3     not sure.

4          But there are plenty of cases that say what the

5     individual plaintiffs thinks really isn't going anywhere under

6     these laws, which isn't just a personal fraud claim.  You have

7     to show what a reasonable consumer -- ordinary consumer, not

8     the most vigilant, not the most, you know, just oblivious, but

9     some reasonable consumer would anticipate.

10          If you have any ability to plead that people out there

11     who are interested in buying natural products, as opposed to

12     some of them just totally laboratory-created ones, are aware

13     either of the regs or are used to seeing in some way the words

14     "artificially flavored" when things are, in other words, maybe

15     not knowing where the practice comes from, but aware that these

16     things happen, something like that.

17          But just the plaintiff themselves and with this

18     oblique comment is not going to be enough.  And I'm even

19     questioning whether you can crack this door open to even get

20     through it.  Let alone actually sail through it.  So --

21          **MR. CORRADO:**  They have had already had an opportunity

22     to amend to address this argument --

23          **THE COURT:**  Well, yes, but they were, you know,

24     incrementally trying to get past some of the things that I

25     raised last time.  That you're not giving up on it, I

1    understand that.

2          So I want to be willing to give you leave to amend,

3    but I can't -- I can't go along with it the way it is.  So the

4    question is, is it worth it, or do you just want to appeal me

5    or something -- which is okay too.

6          **MR. WELLER:**  Well, Your Honor, I'd like to -- I'd like

7    to bring your attention to paragraphs 24 through, I believe

8    it's 34 on this label --

9          **THE COURT:**  That's going to be a lot of chit-chat,

10   right?

11         **MR. WELLER:**  Yeah.  I mean -- but I'm more so --

12         **THE COURT:**  I've seen the --

13         **MR. WELLER:**  -- I'm -- more so just want to make a

14   point.  Under the Consumer Legal Remedies Act, it doesn't just

15   present -- prevent false statements.  It prevents statements

16   that could tend to be --

17         **THE COURT:**  Okay.

18         **MR. WELLER:**  -- misleading or confusing to deceive

19   consumers.

20         **THE COURT:**  Yes.

21         **MR. WELLER:**  And if you look at this -- if you take a

22   look at -- at these -- at these labels --

23         **THE COURT:**  Well, I have.

24         **MR. WELLER:**  -- and you take a look at the

25   packaging --

1      **THE COURT:**  Okay.  You're not going to convince me and

2  your record is whatever is in the -- in the papers that you

3  have.  Yes, it has a fruit picture, and it says -- where is

4  it -- "super orange flavored fizzy drink mix with natural

5  flavors."

6      The vast majority of judges who have looked at it have

7  not accepted your argument that it is misleading to a

8  reasonable ordinary consumer; that they would not think that's

9  all natural, and that there are no other natural flavors in

10  there.

11      **MR. WELLER:**  I would submit that if you add -- if you

12  asked ten random consumers -- we'll have to do a survey at one

13  point when we get there.  But if you asked random consumers --

14      **THE COURT:**  Okay.  Before you spend that money,

15  there's at least one case that says that surveys don't help at

16  that point.  I don't remember which one --

17      **MR. WELLER:**  I don't think -- I don't think you're

18  going to get ten people to look at this label and just have one

19  person say, "Oh, it must have artificial ingredients."

20      It's -- it's purposely deceptive and it's intentional

21  because Haleon is a huge company and they have a lot of really

22  smart marketers, so they will bring it over to a line without

23  maybe making an affirmative misrepresentation, but we still

24  think those statements we're putting out are affirmative

25  misrepresentations.

1    And they know that consumers are going to pay a

2  premium because the consumers are going to believe that this is

3  a naturally-flavored product when they look at it as a whole.

4  And we cited to a bunch of scientific literature on consumer

5  behavior on how consumers view labels as a whole, they don't

6  parse them out.

7    So that -- that's -- that's -- so that would be the --

8    **THE COURT:**  Okay.  All right.  I mean, I understand

9  your argument.  Frankly, as I say, you have pled yourself out

10  of it with your plaintiff who didn't buy the way you said and

11  essentially studied everything before she decided to buy this.

12  But that's not the point.

13    I understand that what you're saying is that people go

14  by impressions as -- overall, as opposed to parsing out the

15  words, yes.  But as I say, they -- the majority of courts, and

16  I go along with this -- have not found that the impression left

17  by that use of words and the pictures with the fruit on it

18  would lead someone to reasonably believe that that's all that

19  was in there was natural flavoring.

20    So if you want to give it a shot, I'll give you

21  another shot to amend, but this would be on the question of

22  what reasonable consumers understand the absence of an

23  "artificially flavored" disclosure to mean, if any of them

24  actually do.

25    **MR. CORRADO:**  And, Your Honor, I would suggest that's

1    futile once you have determined that there's no promise of

2    exclusivity.

3            **THE COURT:**  I know.  And I'll just take the matter

4    under submission on the arguments, but, no, no, I've said the

5    real issue is whether you can -- you have to have as a starting

6    point a viable claim based solely on the label without -- well,

7    solely on the words on the label.  All right?

8            And that you cannot look to the absence of the

9    disclosure, other than perhaps just to beef up your initially

10   viable claim, or whether you can take a claim that's, perhaps,

11   arguably borderline and beef it up into viability.

12           But you can't just say there's a reg out there

13   floating around.  I think that you would have to say in some

14   way that the market for these products is alert in some fashion

15   to the presence and absence of that kind of language in a

16   meaningful way.

17           And I don't know that you can given that your whole

18   view is that these folks really aren't paying that much

19   attention to anything.  But if you want to give it a shot, I'll

20   do it, and then we'll see where we get with that.

21           **MR. WELLER:**  May I ask you a question for

22   clarification, Your Honor?

23           **THE COURT:**  Sure.

24           **MR. WELLER:**  Is it, then, your opinion that it's

25   paragraph 81 that's the limiting factor in this because of the

allegation as to these specific plaintiffs?

**THE COURT:**  I wouldn't put it that way, no.  What I would say is that you don't have, on the words on the label, a viable claim.

And the issue is whether or not people are actually aware that you're supposed to put "artificially flavored" when there's an artificial flavoring -- characteristic artificial flavoring in there.

And there's nothing that says that here.  Okay?

I'm just saying that you've been arguing very passionately that this poor consumer out there is just really in a rush, sees a word, grabs a product, and leaves.  And I just happened to comment that you haven't plead your plaintiff as one of those.  You have plead your plaintiff as being particularly careful.  Okay.  But that's not why I'm ruling the way I am.  That was more of an aside.  Okay.

My ruling is you can't make it on the words, and I'm not sure that you can make it by saying what words aren't there.  Okay?  At least a couple of courts think you can consider that if pled, and I didn't feel it had been pled.  And, frankly, I'm not really satisfied that what the court accepted in *Brown* two -- what I'm calling *Brown* two -- is really good enough.  It seemed pretty conclusory, but anyway...

But I want to give you a shot at it.  And we'll become another one of these many malic acid cases going one way or the

 1    other.  I may never write a big order on this because I don't

 2    think we need it.  But we'll get somewhere at some point.

 3    And -- okay.

 4         So I'll just say the motion is granted with leave to

 5    amend.  And then, when you are amending, you can think about

 6    what I've said about malic acid really isn't so much in and of

 7    itself a flavor, as it may be one of the requisite components

 8    of an artificial flavor created; and then that could be then

 9    that you have an artificial flavor.  But anyway, you can be

10    thinking about that and whether I might be right or wrong in

11    analyzing it that way.

12         Okay.  How much time do you need to decide what you

13    want to do and do it?

14         You don't have to amend, but if you decide to,

15    ultimately what do you want --

16         **MR. WELLER:**  In my experience with the Ninth Circuit,

17    if a district court judge gives us leave to amend, we take it.

18         **THE COURT:**  Okay.  I mean, it's up to you.  You may

19    just say, "Boy, she is totally wrong and let's just take it

20    from here."  But if you want to amend, how much time do you

21    want, several weeks?  Three weeks?  What do you need?

22         **MR. WELLER:**  Well, let's see.  It is --

23         **THE COURT:**  Today is the 11th.

24         **MR. WELLER:**  So what's -- give us about a month on

25    this one, so that puts us --

1           **THE COURT:**  Like May 9?

2           **MR. WELLER:**  May 9 is fine.

3           **THE COURT:**  Is that okay?  All right.

4           All right.  So plaintiff is afforded leave to amend

5    and plaintiffs' -- I guess this would be the second amended

6    complaint -- is to be filed no later than -- here, I'll just

7    give you -- I'll give you to Monday May 12th.

8           **MR. WELLER:**  Okay.  Thank you, Your Honor.

9           **THE COURT:**  Okay.

10          **MR. CORRADO:**  Can we get an extra week until June 2nd

11   to respond?

12          **THE COURT:**  Any particular reason?

13          **MR. CORRADO:**  Just the intervening Memorial Day

14   holiday.

15          **THE COURT:**  All right.  Any opposition is due June 2,

16   and then, after that, we'll just say the reply by the -- well,

17   actually, I'll let you file the reply by the 16th, because I'm

18   going to be away.  Okay.  Otherwise it would be the 9th.  Okay.

19   In other words, you've got three weeks -- let me go back to

20   this for a minute.  What did I do?

21          I said May 12th -- one, two, three weeks is June 2.

22   So you've got an extra week.  All right.  They got -- and then

23   I'll give them one extra week to do the reply so -- because I'm

24   not going to be here anyway on the 9th.

25          **MR. WELLER:**  So that's May 12th, June 2nd, and

1  June 16th?

2          **THE COURT:**  Right.

3          **MR. WELLER:**  Great.  Thank you, Your Honor.

4          **THE COURT:**  All right.  So we'll give you that little

5  breather, for whatever it's worth.  Okay.  All right.  Well,

6  thank you.

7          **MR. WELLER:**  Well, thank you, Your Honor.  We're going

8  to keep doing this until we get it right.

9          **MR. CORRADO:**  Thank you for your time.

10          **THE COURT:**  You may get it right and I might think

11  it's wrong, but we'll see where we go.

12          **MR. WELLER:**  We're going to get it right.

13          **THE COURT:**  Thanks a lot.

14          **MR. CORRADO:**  Do we have a case management conference

15  scheduled?

16          **THE COURT:**  When is it?

17          **MR. CORRADO:**  May 16th.

18          **THE COURT:**  We don't want it all on the same day that

19  we're filing a reply or even that there's still briefing or a

20  hearing.  Assuming they file one on the -- and the briefing

21  goes to the 16th, the earliest hearing you can have is

22  two weeks from that, which would be the 30th.  And I don't know

23  when for sure I would decide it.  Why don't we just move the

24  case management conference to -- I'm just going to pick a date

25  arbitrarily.  If it turns out that it's not good, give me a

 1  stipulation to --

 2          **MR. WELLER:**  And this will be via Zoom then, this case

 3  management?

 4          **THE COURT:**  Yes, it will be via Zoom.

 5          Why don't we just say September 12th with a statement

 6  by the 5th.  All right -- unless you know you're going to be

 7  away.

 8          **MR. CORRADO:**  Thank you.

 9          **THE COURT:**  So it's continued to the 12th, statement

10  by the 5th, and if for some reason that doesn't work out, you

11  have good reason to change it, just give me a stip, I'll change

12  it.

13          Okay.  All right.  Thank you, Counsel.  Have a good

14  weekend.

15          **THE CLERK:**  Court is in recess.

16          **MR. WELLER:**  Thank you.

17          **MR. CORRADO:**  Thank you, Your Honor.

18              (Proceedings adjourned at 10:23 a.m.)

19                      ---o0o---

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:     Thursday, April 17, 2025




_____
  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
        Official Reporter, U.S. District Court