1  Charles C. Weller (SBN: 207034)
2  legal@cweller.com
   CHARLES C. WELLER, APC
3  11412 Corley Court
   San Diego, California 92126
4  Tel: 858.414.7465
   Fax: 858.300.5137
5
6  Attorney for Plaintiffs

7

8  **IN THE UNITED STATES DISTRICT COURT**
   **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

9

10  JIMY RUIZ and ALLAN WONG,          )  No. 3:24-cv-06776-MMC
    *individually and on behalf of all those*  )
11  *similarly situated*,              )  **SECOND AMENDED**
                                       )  **CLASS ACTION COMPLAINT**
12                      *Plaintiff*,    )
                                       )  JURY TRIAL DEMANDED
13  *v.*                               )
                                       )
14  GLAXOSMITHKLINE CONSUMER            )
    HEALTHCARE HOLDINGS (US) LLC        )
15  d/b/a Haleon, *a Delaware limited liability*  )
    *company*,                         )
16                                     )
17                      *Defendant*.    )
    _____
18

19      Allan Wong and Jimy Ruiz ("Plaintiffs"), individually and on behalf of all others

20  similarly situated throughout the state of California, by and through undersigned counsel, hereby

21  bring this action against GlaxoSmithKline Consumer Healthcare Holdings (US) LLC dba

22  Haleon ("Haleon"), alleging that its Emergen-C dietary supplements (Raspberry, Super Orange,

23  Tangerine, Cranberry Pomegranate, Pink Lemonade, Strawberry-Kiwi, and Tropical flavors)

24  (collectively, "the Products"), which are manufactured, packaged, labeled, advertised,

25  distributed, and sold by Defendant, are misbranded and falsely advertised because they contain

26  artificial flavoring, and upon information and belief and investigation of counsel alleges as

27  follows:

28

-1-

## PARTIES

1.     Plaintiff Jimy Ruiz is and at all times relevant was a citizen of the state of California, domiciled in Chula Vista, California.

2.     Plaintiff Allan Wong is and at all times relevant was a citizen of the state of California, domiciled in Brentwood, California.

3.     Defendant GlaxoSmithKline Consumer Healthcare Holdings (US) LLC d/b/a Haleon is a Delaware limited liability company with its principal place of business and headquarters in New Jersey. On information and belief, decisions relating to marketing, labelling, and formulation of the Products are made at this corporate headquarters. Based on a review of Defendant's corporate filings, none of the current managers and members of Defendant are citizens or residents of California.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, Pub. L. 109-2, 119 Stat. 4 (codified in scattered sections of Title 28 of the United States Code); specifically, under 28 U.S.C. § 1332(d), which provides for the original jurisdiction of the federal district courts over "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and [that] is a class action in which . . . any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A).

5.     Plaintiffs seek to represent Class members who are citizens of states different from the Defendant.

6.     The matter in controversy in this case exceeds $5,000,000 in the aggregate, exclusive of interests and costs.

7.     In addition, "the number of members of all proposed plaintiff classes in the aggregate" is greater than 100. *See* 28 U.S.C. § 1332(d)(5)(B).

8.     In the alternative, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). The amount in controversy excludes $75,000, exclusive of interest and costs.

9.     This Court has personal jurisdiction over Defendant because this action arises out of and relates to Defendant's contacts with this forum.

10.     Those contacts include but are not limited to sales of the Products directly to commercial and individual consumers located in this district, including at least one Plaintiff; shipping the Products to commercial and individual consumers in this district, including at least one Plaintiff; knowingly directing advertising and marketing materials concerning the Products into this district through wires and mails, both directly and through electronic and print publications that are directed to commercial and individual consumers in this district; and operating an e-commerce web site that offers the Products for sale to commercial and individual consumers in this district, as well as offering the Products for sale through third-party e-commerce websites, through both of which commercial and individual consumers residing in this district have purchased the Products.

11.     Defendant knowingly directs electronic activity and ships the Products into this district with the intent to engage in business interactions for profit, and it has in fact engaged in such interactions.

12.     Defendant also sells the Products to retailers and wholesalers in this district for the purpose of making the Products available for purchase by individual consumers in this district.

13.     The losses of some Class members were sustained in this district.

14.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this district.

15.     Venue is also proper pursuant to 28 U.S.C. § 1391(c)(2) because this Court maintains personal jurisdiction over Defendant.

## FACTUAL ALLEGATIONS

**A.     Consumers Pay A Premium for "Clean Labels."**

16.     Across the globe, consumers are increasingly attuned to claims that foods are "all-natural," minimally processed, or otherwise free of artificial flavors and preservatives.

17.     For example, a 2018 survey by L.E.K. Consulting found that overwhelming numbers of consumers were committed or casual adherents to so-called "clean label" food attributes: "No artificial ingredients" (69 percent); "No preservatives" (67 percent); or "All-natural" (66 percent). These were the three most attractive attributes in the consumer survey. Roughly 60 to 70 percent of consumers reported a willingness to pay a price premium for "clean label" foods. *See* https://www.lek.com/insights/ei/next-generation-mindful-food-consumption.

18.     This consumer preference has led to an explosion in the category of "clean label" foods and beverages. Leading analyst Allied Market Research estimated that the "natural foods and drinks" category would grow by an estimated compound annual growth rate of 11.4 percent from 2016 to 2031, reaching $361 billion in annual sales by 2031. *See* https://www.alliedmarketresearch.com/natural-food-and-drinks-market.

19.     On or about January 20, 2024, Mr. Ruiz purchased the Super Orange and Tangerine flavors from a Costco store in Chula Vista, California.

20.     On or about January 9, 2024, Mr. Wong purchased the Raspberry and Super Orange flavor Products from a Costco store in Antioch, California.

21.     Wong and Ruiz both prefer to consume only products that contain all-natural flavorings, and frequently review the flavoring claims made on product labels in order to understand the flavorings in food products they are considering for purchase.

**B.      Defendant's Use of Synthetic Flavorings and Deceptive Labels.**

22.     Haleon formulates, manufactures, and sells Emergen-C, a drink mix powder that purports to contain 1,000 mg of Vitamin C per serving. These powders are marketed as providing immune system support, anti-oxidants, and other nutrients that support health and wellness.

23.     These dietary supplements come in seven different flavors: Raspberry, Super Orange, Tangerine, Cranberry Pomegranate, Pink Lemonade, Strawberry-Kiwi, and Tropical. However, the Products differ only in flavoring; the base formulation for each flavor is the same, and they are offered for sale for an identical price.

24.     A true and correct photograph of the Super Orange flavor (on information and belief, the most popular flavor of the Products) is shown here:



25.     Haleon's thought, time, diligence, creativity, and money spent in branding and marketing its Products is evident. Defendant's labeling and advertising scheme is deliberately intended to give consumers the impression that the Products are composed only of natural flavors.

26.     The front label (or "principal display panel") of all flavors of the Products describe them as "Flavored Fizzy Drink Mix With Natural Flavors," with "Natural Flavors" highlighted in bold text:



27.     A separate, prominent graphical element of all flavors of the Products displays the bolded text "Natural Fruit Flavors," set off and highlighted from all other elements of the label:



28.     The label of all flavors of the Products also displays fresh fruit that corresponds to the "characterizing" fruit flavor of the Products, directly next to the "Natural Flavors" claim:



29.    The centrality of fruit flavoring to the Products is also highlighted by the color of

the packaging (including the depiction of the beverage) of all flavors of the Products, which

changes based on the characterizing flavor—orange for Super Orange, dark red for Cranberry-

Pomegranate, lighter red for raspberry, orange-yellow for Tangerine, and so forth:






SECOND AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

30.    All of these elements are repeated on the top of the packaging of each flavor of the Products, as shown here in a photograph of the container purchased by one of the Plaintiffs:



31.    Then, directly underneath the ingredients list where "malic acid" is listed as an ingredient, the back label of each flavor of the Products repeats the claim that the Products contain "Natural Sweeteners & Flavors":

-8-

32.     And all of these elements are repeated again on the individual packets of each

flavor of the Products contained within the larger packaging:



33.     Finally, other descriptions of the Products on the label highlight the alleged

naturalness of the Products. For example, all flavors of the Products are described as "Caffeine-

Free, Gluten-Free, Vegetarian, and Natural Sweeteners," which are descriptors that call to mind

naturalness and being free of processed or artificial ingredients. They purport to contain "As

Much Vitamin C as 10 Oranges!" And the side panel of each flavor of the Products' package

shows the mix being poured into a glass of water while encouraging consumers to enjoy their

"sunshine-y citrus deliciousness" and to "Feel The Good." Referring to the Products, the side

panel also claims that "Naturally, It's Good For You"—a statement clearly meant to convey the

message that what is "good for you" about these Products ***is that they are natural***:



34.    In total, the combination and repetition of text, graphical elements, colors, and pictures on the Products' packaging is designed to give reasonable consumers the overall impression that the Products are composed only of natural flavors.

35.    This conclusion is consistent with academic research based on consumer surveys, which has found that "consumers look at the whole product primarily to make decisions about naturalness." Tyler Murley & Edgar Chambers, *The Influence of Colorants, Flavorants and Product Identity on Perceptions of Naturalness*, 8 FOODS 317, 350 (Aug. 2019), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC6722695/#sec1-foods-08-00317.

36.    This finding is consistent with academic literature that finds that consumers tend to "satisfice" when reviewing food labels, rather than scrutinizing them carefully. That is, pressed for time and confronted by numerous options, they tend to review disclosures on labels quickly to assimilate pertinent information and make a "good-enough" decision, rather than

analyzing specific details or any claim or attribute in depth. *See* Lauren E. Willis, *Decisionmaking and the Limits of Disclosure: The Problem of Predatory Lending: Price*, 65 Md. L. Rev. 707, 742, 767-69 (2006).

37.    Consumers are even more likely to take these shortcuts for low-dollar purchases—such as the Products—where consumers perceive the stakes to be low. Decision-making about such products "involves a simpler process of choice where heuristics are more easily applied." Tilde Heding, *et al*., Brand Management: Research, Theory and Practice 93 (2d ed. 2016).

38.    In designing labels, marketers understand consumers' tendency to "satisfice" and respond accordingly. Given the number of products in an average supermarket (about 50,000), marketers are aware that they have "about one-tenth of a second to make an impression on the shopper." Allan J. Kimmel, Psychological Foundations of Marketing 90-91 (2d ed. 2018).

39.    As such, marketers convey desired impressions about a product through repetition of key text (such as the word "Natural," which is repeated on multiple times on multiple panels of the Products' packaging), design elements that highlight desired attributes, and colors and photos that convey those attributes immediately. For example, it is well-recognized in the marketing profession that particular colors are strongly associated with particular flavors: orange for oranges, yellow for lemons, red for strawberries and cherries. *See* Debra Zellner &Paula Durlach, *Effect of Color on Expected and Experienced Refreshment, Intensity, and Liking of Beverages*, 116 Am. J. Psychol. 633, 639-41 (2003), *available at* https://pubmed.ncbi.nlm.nih.gov/14723247/. Marketers therefore use color to convey messages about flavor where flavor is a central attribute of a product.

40.    Here, Defendant painstakingly and intentionally designed its Products' labels to deceive consumers into believing that there are no artificial flavors used in the Products.

41.     Repetition of key text such as "Natural"—which is repeated multiple times on the front, top, side, and back of the Products' packaging, and also highlighted through bolding and graphical treatment—and the conflation of that adjective each time with the noun "Flavor" (or some cognate thereof) is a clear attempt by Defendant to convey to satisficing consumers that the Products are naturally flavored.

42.     Indeed, Defendant goes so far as to place a "Natural Flavors" claim directly adjacent to the Products' ingredients list, to ensure that even a consumer who viewed that list to investigate what specific components are in the Products would receive the impression that the flavors set forth in that ingredients list are natural flavors.

43.     Other elements support this deliberate effort by Defendant to convey that only natural flavoring is used in its Products. The color of the packaging and the depictions of fruits reinforce both the characterizing flavor and claim of naturalness, while the "natural" claim is further reinforced by use of descriptors such as "Vegetarian" and "Natural Sweeteners," as well as the invitation to "Feel the Good!" Even the health claims of the Products are linked to their supposed naturalness, through the claim that "Naturally, it's good for you!"

44.     In short, the repetition of the words "Natural" and "Natural Flavors" over multiple panels of the Products' packaging; the positioning, highlighting, and bolding of the relevant text; the use of colors; the use of other descriptors that convey naturalness; and the depictions of fruits, are not accidental. Defendant designed all of these elements the Products' packaging quite deliberately to work together to convey to reasonable consumers the impression that the Products are flavored only with natural fruit flavors.

45.     This claim is false and/or misleading. All of the Products contain an ingredient known as "malic acid" which is used as a flavoring in the Products. The form of malic acid used in these Products is artificial, as set forth in greater detail below.

46.     The word "malic" in malic acid derives from the Latin *malum*, for apple. Malic acid derived from natural fruit sources (usually apples) is commonly known as "L-malic acid" instead of its scientific name, 2-Hydroxybutanedioic acid. L-malic acid is quite expensive and is generally cost-prohibitive to use in mass-produced foods and beverages.

47.     There is a synthetic or artificial version of malic acid derived from a petroleum substrate and other synthetic components. It is commonly referred to as DL-malic acid, instead of its scientific name of d-hydroxybutanedioic acid. DL-malic acid is manufactured in petrochemical plants from benzene or butane—components of gasoline and lighter fluid, respectively—through a series of chemical reactions, some of which involve highly toxic chemical precursors and byproducts.

48.     Federal regulations state explicitly that "DL-malic acid does not occur naturally." 21 C.F.R. § 184.1069(a).

49.     When testing malic acid to determine whether it is artificial (DL) or natural (L) malic acid, the industry standard is to test for the presence of the "D isomer" of malic acid. This isomer is not present in any amount in L-malic acid. The presence of the D isomer of malic acid in any amount in a food or beverage indicates the use of artificial DL-malic acid instead of natural L-malic acid.

50.     Counsel for Plaintiff commissioned testing of the specific items that were purchased by Plaintiffs. That testing was conducted on or about April 30, 2024 by Krueger Food Laboratories, Inc. of Chelmsford, Massachusetts, a reputable independent food testing and analysis laboratory that has conducted testing for the food and beverage industry since 1984.

51.     This testing by Krueger Food Laboratories revealed that the D isomer was present in the Products purchased by Plaintiffs. This testing therefore establishes that the malic acid used in these Products is DL-malic acid, and not L-malic acid. And as stated explicitly in federal

regulations incorporated as substantive state law, "DL-malic acid does not occur naturally." 21 C.F.R. § 184.1069(a).

52.     Either L- or DL-malic acid can be used by itself or blended with other acids to produce a number of unique and distinct flavor properties. It is added to foods, beverages and candies to give them a sweet-and-tart taste, and some fruit juice and carbonated beverages rely on malic acid as a flavoring agent. It is especially useful in the formulation of powdered drinks because of its rapid dissolution rate and broader, more natural flavor profile, and for being more stringent than other acids, which means less acidulant is required and unit weight can be reduced. *See generally* Pam Hartwig & Mina McDaniel, *Flavor Characteristics of Lactic, Malic, Citric, and Acetic Acids at Various pH Levels*, 60 J. FOOD SCI. 384 (2006); Laszlo P. Somogyi, "Direct food additives in food processing," Ch. 13 in Diane Barrett, Laszlo P. Somogyi, and H. Ramaswamy, PROCESSING FRUITS (2d. ed. 2005).

**C.    Malic Acid Is Used In the Products As A Flavor.**

53.     Under federal regulations that are incorporated as California law through the Sherman Law, Cal. Health & Saf. Code § 109875, *et seq.*, "flavor" in any food is **_any_** substance, the function of which is to impart taste. *See* 21 C.F.R. § 101.22(a)(1) and (3).

54.     "Taste," in turn, is the combination of sensations arising from specialized receptor cells located in the mouth. *See* Gary Reineccius, FLAVOR CHEMISTRY AND TECHNOLOGY § 1.2 (2d ed. 2005).

55.     The fruity "taste" of fruit-flavored foods is imparted by the interactions between sugars, acids, lipids, and various volatile compounds, which activate those receptors. The overall profile of a fruit flavor in a food is determined by the ratio between sugars (mainly glucose and fructose) and acids, such as citric and malic acid. Fruits such as oranges and strawberries have

their own natural ratio of sugars and acids. *See, e.g.*, Y.H. Hui, et al., HANDBOOK OF FRUIT AND VEGETABLE FLAVORS 693 (2010).

56.    That is, as a matter of food chemistry, there is no such flavor as "strawberry" or the like. Rather, there is a ratio between acids and sugars that is consistent with what the human tongue senses and understands as the flavor "strawberry," and that is naturally found in strawberries. *See, e.g.*, Robert Walker and Franco Famiani, "Organic Acids in Fruits: Metabolism, Functions, and Contents," ch. 8 in 45 HORTICULTURAL REVIEWS 371 (2018).

57.    Malic acid is found in various concentrations in almost all fruits. It is associated with two of the five primary taste sensations—sweetness and sourness—that are the main taste sensations of the Products. *See id.*

58.    By changing the ratio between sugars and acids through the addition of malic acid in foods and beverages, a manufacturer is enabled to create from scratch or simulate a "flavor" such as strawberry, by replicating the sugar/acid ratio present in strawberries in nature.

59.    By adding malic acid to a food or beverage, the manufacturer is also enabled to creates tastes that resemble or reinforce the characterizing fruit flavor of the food product by providing different sweet and sour notes or "perceptions" to a flavor. A food manufacturer, for example, can use different acids (in various concentrations) to create the perception of a sweet and sour taste akin to that of vinegar by using acetic acid; to that of cream or milk by using lactic acid; to that of lemons by using citric acid; and to that of wine by using tartaric acid. Malic acid gives foods a mellower, "fruitier" sweet and sour taste reminiscent of apples. *See, e.g.*, Reineccius, *supra.*

60.    That is, by increasing malic acid in a food formulation (often in combination with other acidulants such as citric and tartaric acids), manufacturers are enabled to push the flavor notes of a fruit flavor away from the vinegary sourness achieved by the use of acetic acid and

towards the mellower sourness achieved by the use of malic acid, or to undercut the tanginess of citric acid. *See, e.g.*, Reineccius, *supra*. This can increase the food product's commercial acceptability by creating tastes that resemble, but are not exactly like, the natural flavors found in fruits.

61.     Federal regulations promulgated pursuant to the Food, Drug, and Cosmetic Act ("FDCA") require that a food's label accurately describe the nature of the food product and its characterizing flavors. 21 C.F.R. § 102.5(a).

62.     Artificial flavor is defined as "any substance, the function of which is to impart flavor, which is not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof." 21 C.F.R § 101.22(a)(1).

63.     Natural flavor is defined as "essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product of roasting, heating or enzymolysis, which contains the flavoring constituents" from fruits or vegetables, "whose significant function in food is flavoring rather than nutritional." 21 C.F.R § 101.22(a)(3).

64.     Any recognizable primary flavor identified directly or indirectly on the front label of a food product, whether by word, vignette, depiction of a fruit, or other means is referred to as a "characterizing flavor." 21 C.F.R. § 101.22.

65.     If a food product's characterizing flavor is not created ***exclusively*** by the named flavor ingredient, the product's front label must state that the product's flavor was simulated or reinforced, or made to resemble a fruit flavor, through either natural or artificial flavorings or both. Specifically, if any flavoring agent is used to "simulate[], resemble[] or reinforce[]" the characterizing flavor, the front label must prominently inform consumers that the product is "Artificially Flavored." 21 C.F.R. § 101.22(i)(2).

66.     That is, pursuant to 21 C.F.R. § 101.22(i)(2) even if a food or beverage is flavored with strawberries, its label must state that it is "Artificially Flavored" if an artificial substance is used to reinforce the flavor profile of the food product or to simulate or resemble a fruit flavor.

67.     A food product's label also must include a statement of the "presence or absence of any characterizing ingredient(s) or component(s) . . . when the presence or absence of such ingredient(s) or component(s) in the food has a material bearing on price or consumer acceptance . . . and consumers may otherwise be misled about the presence or absence of the ingredient(s) or component(s) in the food." 21 C.F.R. § 102.5.

68.     Such statement must be in boldface print on the front display panel and of sufficient size for an average consumer to notice.

69.     In this case, the combination of sugars and artificial DL-malic acid in Defendants' products is engineered to resemble the natural ratio of sugars and natural L-malic acid that make up the natural flavor of the characterizing fruit of Defendants' Products. But the true flavors of Defendants' Products are not orange, strawberry, tangerine, raspberry and the like; rather, they are artificial DL-malic acid (and other acidulants), sugars, and trace other components that resemble but are not orange, strawberry, tangerine, raspberry and so forth, because the sweetness and sourness of those natural fruits is not dependent on artificial DL-malic acid.

70.     Further, the use of malic acid in the Products pushes the flavor profile of individual flavors toward a mellower and fruitier flavor note than the natural fruit, reinforcing the characterizing flavor.

71.     By (a) creating taste perceptions that resemble those of natural fruits, and (b) reinforcing those fruit flavors to make them mellower and fruitier instead of sharper or more sour as they would be naturally, the DL-malic acid used in the Products by Defendant is a "flavor" within the meaning of 21 C.F.R. § 101.22(i)(2).

72.    DL-malic acid used in the Products is also an "artificial flavor" and not a "natural flavor" as those terms are defined at 21 C.F.R § 101.22(a)(1) and (a)(3) and corresponding state regulations, because it is not derived from a fruit or vegetable or any other natural source, but rather from a petroleum substrate. Therefore, pursuant to 21 C.F.R. § 101.22(i)(2) and corresponding state regulations, its use must be disclosed through an "Artificially Flavored" statement on the front label of the Products.

73.    Further, the presence of artificial DL-malic acid in the Products has a material bearing on price or consumer acceptance of the Products, and consumers may be and have been misled about the presence or absence of the artificial DL-malic acid that is a component in the Product. *See* 21 C.F.R. § 102.5. Among the consumers misled about the presence of artificial DL-malic acid in the Products are the Plaintiffs, as set forth below.

74.    The testing conducted by Krueger Food Laboratories also identified substantial variations in the concentrations of malic acid in various tested flavors of the Products. Within a line of similar product formulations, large variations of malic acid concentration will principally be dictated by taste and flavor considerations. That is, these variations in concentration are highly indicative of a flavoring use. Moreover, the combination of various acids such as malic acid, citric acid, and tartaric acid in these Products has "no obvious functional (*i.e.*, non-flavoring)" purpose.

75.    Based on these testing results, Krueger concludes it is likely that "the varying concentrations of malic acid and other acidulants in these products are for the purpose of reinforcing the characterizing flavor of each product through the manipulation of levels of acidity or sourness."

76.    Because the Products contain artificial flavoring, federal regulations and corresponding state law incorporating and enacting those regulations require the Products to

display both front- and back-label disclosures to inform consumers that the Products are artificially flavored. *See* 21 C.F.R. § 101.22(i)(2).

77.     The Products have none of the required disclosures regarding the use of artificial flavors. In fact, and by way of strengthening the reasonable consumer expectation that a food that was artificially flavored would disclose that fact, the Products' front and back labels bear the false and deceptive statements that they contain "Natural Flavors" and "Natural Fruit Flavors," which statements are reinforced by depictions of fruits and the other graphical and textual elements described herein.

78.     Plaintiffs reserve the right to amend this Complaint to add further products that contain similar label misrepresentations as testing of the Defendant's food products continues.

**D.     Plaintiffs Reasonably Relied on Defendant's Labelling Statements.**

79.     Labels are the chief means by which food product manufacturers convey critical information to consumers, and consumers have been conditioned to rely on the accuracy of the claims made on these labels.

80.     Further, federal law and corresponding state law and regulations both reflect and create reasonable consumer expectations concerning the contents of foods and beverages. That is, consumers have been conditioned to expect that a food product whose packaging deliberately gives the impression that the characterizing flavor is created exclusively by "Natural Flavors" and "Natural Fruit Flavors" does not have its characterizing fruit flavors created, simulated, or reinforced by flavoring agents derived from petroleum substrates. Reflecting the requirements of federal and state law set forth herein, consumers also reasonably expect that the use of artificial flavors in a food would be affirmatively disclosed on the Products' labels.

81.     Plaintiffs reviewed the labels on the Products prior to their purchases, and reviewed the flavoring claims being made on those labels. Plaintiffs reasonably understood

Defendant's pervasive description of the flavoring in its Products as "natural"—especially when combined with Defendant's failure to disclose the use of artificially derived malic acid through an "Artificially Flavored" disclosure—to mean that the Products contain only natural flavorings. These representations were false.

82.    In believing that the use of the word "natural" on the Products' label meant that the Products contained only natural flavors and not any artificial flavors, the Plaintiffs were in good company: This is how the majority of reasonable consumers would interpret the flavoring statements and omissions of affirmative disclosures on the Products' labels.

83.    For example, a survey of more than one thousand consumers by *Consumer Reports* found that two-thirds of consumers believe that the word "natural," when used on a food product, means that the product contains no artificial ingredients (which would include artificial flavorings, as flavorings are an ingredient), while fully 84 percent of consumers believe it *ought* to mean that. Further, nearly half of consumers believe that "natural" claims on food product labels have been independently verified and so can be relied upon by consumers. *See* Andrea Rock, "Peeling Back the 'Natural' Food Label," CONSUMER REPORTS (Jan. 27, 2016), *available at* https://www.consumerreports.org/food-safety/peeling-back-the-natural-food-label/.

84.    Likewise, a survey of American consumers by the International Food Information Council found that more than half of Americans believe the term "natural," when used to describe a food, means the food contains no artificial additives or preservatives, is made from 100% natural ingredients, or is "straight from nature." *See* "Food Decision 2016: National Food and Health Survey," Int'l Food Information Council (May 2016), *available at* https://foodinsight.org/wp-content/uploads/2016/05/2016_executivesummary_final_web.pdf.

85.    Then, a 2018 Ipsos survey of consumers in 28 different countries found that the number one attribute that consumers associate with foods whose labels claim they are "natural"

is "without artificial ingredients." This was the consistent finding in 18 of the 28 countries studied by Ipsos, including 57 percent of consumers in North America. The second-most common attribute that consumers associated with foods described as "natural" was little different: "100% from nature." *See* "Natural: What Does It Mean to Consumers?" Ipsos Polling (April 2018), *available at* https://www.ipsos.com/sites/default/files/ct/publication/documents/2018-04/natural_food.pdf.

86.    In fact, academic researchers studying consumer perceptions and behaviors report that the word "natural" describing a food product is unique in creating a substantial "halo effect" full of positive consumer expectations around a food. *See* Christopher Berry, et al., "It's only natural: the mediating impact of consumers' attribute inferences on the relationships between product claims, perceived product healthfulness, and purchase intentions," 45 J. OF THE ACAD. MARK. SCI. 698–719 (2017), *available* at https://doi.org/10.1007/s11747-016-0511-8.

87.    Other surveys indicate the strong interest that consumers have in foods described as "natural," as well as their declining interest in foods that contain artificial flavors. For example, another survey by the International Food Information Council found that about half of Americans say they seek out natural flavors at least some of the time, 41% seek out natural sweeteners, 40% seek out natural preservatives and 35% seek out colors from natural sources. In contrast, artificial flavors, colors, sweeteners and preservatives were sought out by only about ***one in 10*** consumers, with approximately half saying they avoid each of them at least some of the time. *See* "IFIC Survey: From 'Chemical-sounding' to 'Clean': Consumer Perspectives on Food Ingredients," FOOD INSIGHT (June 17, 2021), *available at* https://foodinsight.org/ific-survey-from-chemical-sounding-to-clean-consumer-perspectives-on-food-ingredients/.

88.    Plaintiffs reasonably relied on Defendant's repeated use of the word "natural" to describe the flavoring in its Products (and the other label elements described herein), as well as

the omission of an expected "Artificially Flavored" disclosure, and reasonably took from those statements and omissions the impression that these Products are exclusively naturally flavored. Defendant made these label statements, and omitted disclosing its use of artificial flavors, precisely because it knows that consumers are incentivized to choose food products that have characteristics its own Products do not have—*i.e.*, all-natural flavorings.

89.    Plaintiffs would not have purchased the Products from Defendant if the truth about the Products was known, or would have only been willing to pay a substantially reduced price for the Products had they known that Defendant's representations regarding flavoring were false and misleading.

90.    In the alternative, because of its deceptive and false labelling statements, Defendant was enabled to charge Plaintiffs a premium for the Products relative to key competitors' products, or relative to the average price charged in the marketplace.

91.    Consumers including Plaintiffs especially rely on label claims made by food product manufacturers such as Defendant, as they cannot confirm or disprove those claims simply by viewing or even consuming the Products. That is, consumers depend on food manufacturers to tell the truth about the characteristics of their products while making decisions about which products to buy and consume. Here, Defendant has not told the truth about the flavoring used in the Products.

92.    Plaintiffs suffered economic injury by Defendant's fraudulent and deceptive conduct as stated herein, and there is a causal nexus between Defendant's deceptive conduct and Plaintiffs' injury.

93.    Defendant is in the best position to know what content it placed on its front and back labels and what chemicals and ingredients are in the Products. Plaintiffs nonetheless satisfy the requirements of Rule 9(b) by alleging the following facts with particularity:

a.  **Who**: Defendant made material misrepresentations of fact regarding the flavoring of the Products on both the front and back labels of the Products when it *inter alia* stated that the Products contained "Natural Flavors" and "Natural Fruit Flavors," giving the impression that only natural flavors were used to generate the taste of the Products. The labelling of these Products is entirely within the control of Defendant. These representations and omissions constitute material misrepresentation and omissions regarding the use of an artificial flavoring (specifically, DL-malic acid) used to simulate, resemble, or reinforce the characterizing flavor of the Products.

b.  **What**: Defendant knew, or should have known, that the DL-malic acid used in the Products was an artificial flavoring. Defendant's conduct here was, and continues to be, fraudulent because it misrepresented that the Products purchased by Plaintiffs contained only "Natural Flavors" and "Natural Fruit Flavors" and thereby induced Plaintiffs to purchase a Product they otherwise would not have purchased, or would have paid a lesser amount for.

c.  **When**: Defendant made the material misrepresentations and omissions set forth herein during the putative Class Period, including prior to and at the time Plaintiffs purchased the Products from Defendant in January 2024, and continues to do so, despite Defendant's knowledge that the Products contained and continue to contain artificial flavorings.

d.  **Where**: Defendant's misrepresentations and omissions, as set forth herein, were made on the Products' front, top, side, and back labels, including the specific Product purchased by Plaintiffs. This Second Amended Complaint sets forth the precise misrepresentations made and includes exemplar photographs of the Products' label containing these misrepresentations.

e. **How**: Defendant made material misrepresentations of fact and omissions on its front and back labels when it stated and gave the impression that the Products contained only "Natural Flavors" and "Natural Fruit Flavors" despite the Products containing an artificial flavoring, DL-malic acid, used to simulate, resemble, or reinforce the characterizing flavor of the Products within the meaning of 21 C.F.R. § 101.22(i)(2).

f. **Why**: Defendant made the material misrepresentations of fact and omissions as set forth herein in order to induce the purchase of the Products by those persons including Plaintiffs who prefer to purchase food products that use only natural flavorings, or to induce those persons to purchase the Products at a higher price than they otherwise would have paid had the truth about the use of DL-malic acid in the Products been known.

## CLASS ACTION ALLEGATIONS

94.    Plaintiffs brings this action individually and as representative of all those similarly situated pursuant to Federal Rule of Civil Procedure 23 on behalf of all consumers in the state of California who purchased the Products within four years prior to the filing of this Complaint.

95.    Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

96.    Plaintiffs reserve the right to alter the Class definition, and to amend this Complaint to add additional Subclasses, as necessary to the full extent permitted by applicable law.

97.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of the claims on a class-wide basis using the same evidence as

individual Class members would use to prove those elements in individual actions alleging the same claims.

98.    **Numerosity – Rule 23(a)(1)**: The size of the Class is so large that joinder of all Class members is impracticable. Plaintiffs believe and aver there are thousands of Class members geographically dispersed throughout the state of California.

99.    **Existence and Predominance of Common Questions of Law and Fact – Rule 23(a)(2), (b)(3)**: There are questions of law and fact common to the Class. These questions predominate over any questions that affect only individual Class members. Common legal and factual questions and issues include but are not limited to:

a.    Whether the marketing, advertising, packaging, labeling, and other promotional materials for Defendant's Products is misleading and deceptive;

b.    Whether a reasonable consumer would understand Defendant's "Natural Flavors" and "Natural Fruit Flavors" claims, as well as the other label elements as described herein, to indicate that the Products contained only natural flavorings, and reasonably relied upon those representations;

c.    Whether Defendant was unjustly enriched at the expense of the Plaintiff and Class members;

d.    Whether Defendant breached an express warranty;

e.    the proper amount of damages;

f.    the proper scope of injunctive relief; and

g.    the proper amount of attorneys' fees.

100.    Defendant engaged in a common course of conduct in contravention of the laws Plaintiffs seek to enforce individually and on behalf of the Class. Similar or identical violations of law, business practices, and injuries are involved. Individual questions, if any, pale by

comparison, in both quality and quantity, to the numerous common questions that predominate this action. The common questions will yield common answers that will substantially advance the resolution of the case.

101.  In short, these common questions of fact and law predominate over questions that affect only individual Class members.

102.  **Typicality – Rule 23(a)(3)**: Plaintiffs' claims are typical of the claims of the Class members because they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct.

103.  Specifically, all Class members, including Plaintiffs, were harmed in the same way due to Defendant's uniform misconduct described herein; all Class members suffered similar economic injury due to Defendant's misrepresentations; and Plaintiffs seek the same relief as the Class members.

104.  There are no defenses available to Defendant that are unique to the named Plaintiffs.

105.  **Adequacy of Representation – Rule 23(a)(4)**: Plaintiffs are fair and adequate representatives of the Class because Plaintiffs' interests do not conflict with the Class members' interests. Plaintiffs will prosecute this action vigorously and are highly motivated to seek redress against Defendant.

106.  Furthermore, Plaintiffs have selected competent counsel who are experienced in class action and other complex litigation. Plaintiffs and Plaintiffs' counsel are committed to prosecuting this action vigorously on behalf of the Class and have the resources to do so.

107.  **Superiority – Rule 23(b)(3)**: The class action mechanism is superior to other available means for the fair and efficient adjudication of this controversy for at least the following reasons

a.  the damages individual Class members suffered are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct such that it would be virtually impossible for the Class members individually to redress the wrongs done to them. In fact, they would have little incentive to do so given the amount of damage each member has suffered when weighed against the costs and burdens of litigation;

b.  the class procedure presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and supervision by a single Court;

c.  the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendant; and

d.  the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would be dispositive of the interests of other Class members or would substantively impair or impede their ability to protect their interests.

108.  Unless the Class is certified, Defendant will retain monies received as a result of its unlawful and deceptive conduct alleged herein.

109.  Unless a class-wide injunction is issued, Defendant will likely continue to advertise, market, promote, and sell its Products in an unlawful and misleading manner, as described throughout this Complaint, and members of the Class will continue to be misled, harmed, and denied their rights under the law. Plaintiffs would like to purchase the Products and other products produced by Defendant in the future, but cannot currently do so because they cannot rely on the Products' labelling, given the deceptions regarding flavoring found there. An

SECOND AMENDED CLASS ACTION COMPLAINT

injunction prohibiting future deceptive labelling is therefore warranted and would provide Plaintiffs and the Class relief.

110.   Furthermore, Plaintiffs have not merely alleged an "informational" injury, but have also alleged that Defendant has been enabled to charge a price premium for the Products. Plaintiffs have therefore alleged that compliance with federal and state regulations regarding the presence of artificial flavors in the Products would cause a decrease in the price of the Products at which Plaintiffs and members of the Class would be willing to buy the Products. As a result, Plaintiffs have alleged more than simply an interest in Defendant telling the truth on its labels, but an economic injury that further supports prospective injunctive relief.

111.   **Ascertainability**. To the extent ascertainability is required, the Class members are readily ascertainable from Defendant's records and/or its agents' records of retail and online sales, as well as through public notice.

112.   Defendant has acted on grounds applicable to the Class as a whole, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

**COUNT 1**
**VIOLATION OF THE CONSUMER LEGAL REMEDIES ACT,**
**CAL. CIV. CODE § 1750 *et seq.***

113.   Plaintiffs reallege the preceding paragraphs as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

114.   Plaintiffs are "consumers" within the meaning of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1761(d).

115.   The sale of Defendant's Products to Plaintiffs and Class members was a "transaction" within the meaning of the CLRA, Cal. Civ. Code § 1761(e).

116.   The Products purchased by Plaintiffs and Class members are "goods" within the meaning of the CLRA, Cal. Civ. Code § 1761(a).

SECOND AMENDED CLASS ACTION COMPLAINT

117.  As alleged herein, Defendant's business practices are a violation of the CLRA because Defendant deceptively failed to reveal facts that are material in light of the flavoring representations that were made by Defendant on the labels of its Products and elsewhere.

118.  Defendant's ongoing failure to provide material facts about its Products on its labels violates the following subsections of Cal. Civ. Code § 1770(a) in these respects:

a.  Defendant's acts and practices constitute misrepresentations that its Products have characteristics, benefits, or uses which they do not have;

b.  Defendant misrepresented that its Products are of a particular standard, quality, and/or grade, when they are of another;

c.  Defendant's acts and practices constitute the advertisement of goods, without the intent to sell them as advertised;

d.  Defendant's acts and practices fail to represent that transactions involving its Products involve actions that are prohibited by law, particularly the use of misleading nutritional labelling; and

e.  Defendant's acts and practices constitute representations that its Products have been supplied in accordance with previous representations when they were not.

119.  By reason of the foregoing, Plaintiffs and the Class have been irreparably harmed, entitling them to injunctive relief.

120.  Pursuant to Cal. Civ. Code § 1782, Plaintiffs notified Defendant in writing of the particular violations of the CLRA described herein and demanded Defendant rectify the actions described above by providing complete monetary relief, agreeing to be bound by their legal obligations and to give notice to all affected customers of their intent to do so.  Plaintiffs sent this notice by certified mail to Defendant, at least 30 days before the filing of this Complaint.

121.   Pursuant to Cal. Civ. Code §§ 1770 and 1780, Plaintiffs and the Class are entitled to recover actual damages sustained as a result of Defendant's violations of the CLRA. Such damages include, without limitation, monetary losses and actual, punitive, and consequential damages, in an amount to be proven at trial.

122.   Pursuant to Cal. Civ. Code §§ 1770 and 1780, Plaintiffs are entitled to enjoin publication of misleading and deceptive nutritional labels on Defendant's Products and to recover reasonable attorneys' fees and costs.

### COUNT 2
### UNJUST ENRICHMENT UNDER CALIFORNIA LAW

123.   Plaintiffs reallege the preceding paragraphs as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

124.   Defendant, through its marketing and labeling of the Products, misrepresented and deceived consumers regarding the flavoring in the Products.

125.   Defendant did so for the purpose of enriching itself and it in fact enriched itself by doing so.

126.   Consumers including Plaintiffs conferred a benefit on Defendant by purchasing the Products, including an effective premium above their true value. Defendant appreciated, accepted, and retained the benefit to the detriment of consumers.

127.   Defendant continues to possess monies paid by consumers to which Defendant is not entitled.

128.   Under the circumstances it would be inequitable for Defendant to retain the benefit conferred upon it and Defendant's retention of the benefit violates fundamental principles of justice, equity, and good conscience.

129.   Plaintiffs seek disgorgement of Defendant's ill-gotten gains and restitution of Defendant's wrongful profits, revenue, and benefits, to the extent, and in the amount, deemed

appropriate by the Court, and such other relief as the Court deems just and proper to remedy Defendant's unjust enrichment.

130.   Plaintiffs have standing to pursue this claim as Plaintiffs have suffered injury in fact as a result of Defendant's actions as set forth above.

## COUNT 3
## BREACH OF EXPRESS WARRANTY UNDER CALIFORNIA LAW

131.   Plaintiffs reallege the preceding paragraphs as if fully set forth herein and, to the extent necessary, plead this cause of action in the alternative.

132.   Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, expressly warranted that the Products contained only "Natural Flavors" and "Natural Fruit Flavors."

133.   Defendant's express warranties, and its affirmations of fact and promises made to Plaintiffs and the Class and regarding the Products, became part of the basis of the bargain between Defendant and Plaintiffs and the Class, which creates an express warranty that the Products would conform to those affirmations of fact, representations, promises, and descriptions.

134.   The Products do not conform to the express warranty that the Products contained only "Natural Flavors" and "Natural Fruit Flavors" because they contain ingredients that are unnatural and synthetic, *i.e.*, DL-malic acid.

135.   As a direct and proximate cause of Defendant's breach of express warranty, Plaintiffs and Class members have been injured and harmed because: (a) they would not have purchased the Products on the same terms if they knew the truth about the Products' unnatural ingredients; (b) they paid a price premium based on Defendant's express warranties; and (c) the Products do not have the characteristics, uses, or benefits that were promised.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court grant the following relief against Defendant:

a. Certifying the Class;

b. Declaring that Defendant violated the statutes cited herein and/or was unjustly enriched and/or breached an express warranty;

c. Awarding actual and other damages;

d. Ordering an awarding of injunctive relief, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

e. Ordering Defendant to pay reasonable attorneys' fees and litigation costs to Plaintiffs;

f. Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

g. Such other relief as the Court may deem just and proper.

TRIAL BY JURY IS DEMANDED ON ANY COUNTS SO TRIABLE.

Respectfully submitted,

/s/ *Charles C. Weller*
Charles C. Weller (Cal. SBN: 207034)
Attorney for Plaintiff

CHARLES C. WELLER, APC
11412 Corley Court
San Diego, California 92126
Tel: 858.414.7465
Fax: 858.300.5137

May 12, 2025

SECOND AMENDED CLASS ACTION COMPLAINT